FILED
2006 Jun-21  AM 11:15
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## JASPER DIVISION

------------------------------------------------------------ x

GREGORY HUNT,                                               x

       Petitioner,                                    x

                              x          Case No:

   v.                                                      x          6:06-cv-____ -__-___

                              x

RICHARD ALLEN, Commissioner, Alabama          x
Department of Corrections,                                 x

             Respondent.                           x

------------------------------------------------------------ x

## PETITION FOR WRIT OF HABEAS CORPUS BY
## PRISONER IN STATE CUSTODY UNDER DEATH SENTENCE

Prisoner Gregory Hunt, now incarcerated on death row at Holman State Prison in Atmore, Alabama, respectfully petitions this Court for relief from his unconstitutionally obtained conviction and sentence.

## I.    <u>INTRODUCTION</u>

1.    Mr. Hunt petitions for a writ of habeas corpus under 28 U.S.C. § 2254.  Mr. Hunt was convicted of capital murder in the Walker County Circuit Court in 1990, and was sentenced to death.

2.    Mr. Hunt's appointed counsel in this trial for his life spent only 45 hours preparing, and conducted no investigation whatsoever into the wealth of mitigation evidence that could have saved Mr. Hunt's life.   The failure to

investigate was total: counsel interviewed no family members, friends or employers; contacted virtually none of the fact witnesses who testified at trial; and obtained no records or other evidence.   This complete lack of preparation manifested itself at every stage of Mr. Hunt's trial, as his trial counsel were thoroughly unequipped to make the strategic judgments that are the essence of legal representation and advocacy. .

3.    At the penalty phase, Mr. Hunt's counsel did nothing to save their client's life.   The transcript of the entire penalty phase is five and a half pages long.  Mr. Hunt's counsel put on no witnesses, introduced no evidence, and failed entirely to rebut the prosecution's arguments about why Mr. Hunt should be executed.  Instead, the penalty phase of Mr. Hunt's capital trial consisted only of rambling remarks by his trial counsel about why "maybe" the jury should not choose death, but absolutely nothing to persuade them otherwise.

4.     Likewise, at the sentencing hearing, the trial court invited Mr. Hunt's counsel to argue why his life should be spared, and they declined.

5.    Mr. Hunt's jury and sentencing judge thus never heard the abundance of potentially mitigating evidence that his trial counsel failed to discover and present.   These included Mr. Hunt's childhood growing up in an extremely violent, alcoholic family, in which he suffered serious physical abuse at the hands of his alcoholic father and repeatedly witnessed his father beating his mother and

2

sexually abusing his sister in the family home.   Because of the abuse, he and his siblings were taken from their parents and became wards of the state, living in harsh group homes.  Eventually they were sent back to their parents, where the physical abuse resumed, and Mr. Hunt would grow enraged seeing his alcoholic step-father abuse his mother.  By around the age of 13, Mr. Hunt was living on the streets or in trailers in the Miami housing projects.

6.    Even though the issues of drug and alcohol intoxication were a central part of this case, given the extensive testimony that Mr. Hunt was impaired by cocaine, pills and alcohol on the night the crime was committed, his trial counsel did not investigate and present any evidence concerning his long-standing history of behavioral changes under the influence of drugs and alcohol.  These began from the age of 10, while Mr. Hunt in the state home, and continued throughout his adult life.  Nor did his trial counsel make use of the evidence that was adduced at trial about drug use to show that he lacked the requisite intent to be convicted of capital murder.

7.    Had the jurors and the judge known all they should have known about Mr. Hunt, his history and his background, Mr. Hunt would likely not have been convicted of capital murder and he certainly would not have been sentenced to death.  As a result of Mr. Hunt's lawyer's ineffectiveness, there are serious questions about the reliability of the verdict and sentence in this case

3

8.     The reliability of Mr. Hunt's conviction and sentence are further undermined by the State's wholly misleading examination of its most damaging witness, a jailhouse informant who testified about an alleged "confession" made by Mr. Hunt.  The State made crystal clear to the jury that this jailhouse witness, James Carr Sanders, had already been sentenced and would gain nothing from his testimony.  In fact, this was not true, and Mr. Sanders' criminal cases were dismissed after he testified against Mr. Hunt.

## II.    <u>PROCEDURAL HISTORY</u>

9.     On August 3, 1988, Mr. Hunt was arrested for capital murder in connection with the death of his girlfriend, Karen Lane.  His trial counsel were not appointed until February 21, 1990 and May 1, 1990 respectively, shortly before the scheduled trial date of May 14, 1990.

10.     On June 19, 1990, Mr. Hunt was convicted in the Walker County Circuit Court (docket number  CC-89-79.60) of capital murder in violation of Ala. Code §§13A-5-40(a)(4) & (a)(8).   The extremely brief penalty phase was held that evening at 8:00 p.m., and Mr. Hunt's counsel introduced no witnesses or evidence and made little argument.  By a vote of 11-1, the jury recommended that Mr. Hunt be sentenced to death.

11.     On July 27, 1990, the trial court held a sentencing hearing, inviting

Mr. Hunt's counsel to argue why his life should be spared.  Trial counsel made no

argument.   Judge James Brotherton sentenced Mr. Hunt to death that same day.

     12.    Both of Mr. Hunt's trial counsel passed away after his trial. Mr.

Hunt's first appellate counsel, Stanley Cohen, filed numerous motions seeking to

obtain or reconstruct their files and correct the record on appeal.   The trial court

never ruled on all of the motions, and never completed the task of compiling the

correct record for appellate review.   Mr. Cohen was replaced by other appellate

lawyers, who likewise did not pursue or obtain a correct record.

     13.    The Alabama Court of Criminal Appeals affirmed Mr. Hunt's

conviction and sentence on February 11, 1994.  <u>Hunt v. State</u>, 659 So.2d 933 (Ala.

Crim. App. 1994).

     14.    The Alabama Supreme Court affirmed Mr. Hunt's conviction and

sentence on February 17, 1995.  <u>Ex Parte Hunt</u>, 659 So.2d 960 (Ala. 1995)

     15.    The United States Supreme Court denied Mr. Hunt's petition for a

writ of *certiorari* on October 2, 1995.  <u>Hunt v. Alabama</u>, 116 S. Ct. 215 (1995).

     16.    On February 18, 1997, Mr. Hunt filed *pro se* in the Walker County

Circuit Court a Petition for Relief from Judgment Pursuant to Ala. R. Crim. Pro.

Rule 32 (docket number CC-89-76.60).  He later obtained *pro bono* counsel, who

filed an Amended Petition for Relief from Judgment on May 25, 2002 ("Amended

Rule 32 Petition.")  The Amended Rule 32 Petition was decided by Judge James

Brotherton, the same judge who had sentenced Mr. Hunt to death.

17.    The trial court held a hearing on July 22, 2002, at which it refused to admit or consider detailed mitigation evidence that trial counsel had failed to investigate and discover.

18.    By order dated December 17, 2002, the trial court denied the Rule 32 petition by signing without modification an order drafted by the Alabama Attorney General's office.  The trial court did not even correct any of the mis-spelling the Attorney General's office had made, nor even the reference by name to an entirely different defendant.

19.    On August 26, 2005, the Alabama Court of Criminal Appeals affirmed the trial court's denial of post-conviction relief.  Hunt v. State, No. CR-02-0813, 2005 WL 2046326 (Ala. Crim. App. Aug. 26, 2005).   The Court granted rehearing, and affirmed its denial of the Petition, on November 23, 2005.  Hunt v. State, No. CR-02-0813, 2005 WL 3118805 (Al. Crim. App. Nov. 23 2005).

20.    On April 21, 2006, the Alabama Supreme Court denied Mr. Hunt's petition for a writ of certiorari.

21.    Mr. Hunt filed a pro se petition for a writ of habeas corpus in the United States District Court for the Northern District of Alabama on May 15, 2002.  Hunt v. Jones,  No. 02-N-1213-J (N.D. Ala.).  On August 8, 2002, the court, Judge Edwin Nelson, entered an order dismissing the petition without

6

prejudice to permit Mr. Hunt to exhaust his state court remedies.

III.    **GROUNDS SUPPORTING PETITION FOR RELIEF**

A.    **MR. HUNT WAS DENIED A FAIR TRIAL BY THE PROSECUTION'S MISCONDUCT AND VIOLATION OF ITS OBLIGATIONS UNDER BRADY V. MARYLAND.**

22.    The prosecution violated its constitutional obligations under Brady v. Maryland with respect to the testimony of key prosecution witness James Carr Sanders.  Mr. Sanders provided extremely damaging and pivotal testimony for the prosecution, testifying that Mr. Hunt confessed to him while both were being held in the Walker County Jail.

23.    During his testimony, Mr. Sanders insisted that he received no promises from the prosecution and that he had no expectation of receiving any benefit in exchange for his testimony.  Further, during his examination of Mr. Sanders, the prosecuting attorney twice stated unequivocally to the jury that Mr. Sanders was going to the state penitentiary for at least fifteen years under Alabama's habitual offender statute.  The prosecutor said it again during his closing argument.

24.    This was simply false.  In reality, Mr. Sander's criminal cases were still pending before the same judge as was presiding over Mr. Hunt's trial and

were being prosecuted by the same District Attorney.

25.    As evidence presented at the post-conviction proceedings in state court established, less than one month after testifying against Mr. Hunt and sealing the prosecution's case against Mr. Hunt at trial, the charges against Mr. Sanders were dropped, he was released from jail, and he was restored to probation, in essence the complete opposite of fifteen years in the penitentiary.

26.    These circumstances demonstrate quite clearly that the prosecutor misled defense counsel and the jury with its unequivocal assertions, representing it as a foregone conclusion that Mr. Sanders was going to prison for at least fifteen years despite testifying for the prosecution on a key material issue at Mr. Hunt's capital trial.  This misconduct deprived Mr. Hunt of a fair trial and reliable verdict.

27.    The prosecution also violated Brady v. Maryland by not disclosing to defense counsel that agents of the prosecution were undertaking affirmative efforts to have inmates at Walker County Jail fabricate testimony of an alleged jailhouse confession by Mr. Hunt.

28.    The state court adjudication of these claims was contrary to, and an unreasonable application of, clearly established United States Supreme Court precedent.

**B.    MR. HUNT WAS DENIED EFFECTIVE ASSISTANCE OF
COUNSEL AT ALL PHASES OF HIS CAPITAL TRIAL,
SENTENCING AND APPEAL**

29.    Mr. Hunt was denied effective legal representation during all phases
of his capital trial and appeal.  As a result of these failures, he was convicted and
sentenced to death, and was denied his rights under the Fourth, Fifth, Sixth,
Eighth, and Fourteenth Amendments to the United States Constitution.

### 1.    Governing Standards

30.    Because this was a capital trial, exacting standards of fairness must be
met and there is a special need for reliability.  Johnson v. Mississippi, 486 U.S.
578, 584 (1988); Gardner v. Florida, 430 U.S. 349 (1977).  A defendant facing
capital punishment "requires the guiding hand of counsel at every step in the
proceeding against him."  Powell v. Alabama, 287 U.S. 45, 69-72 (1932).  The
right to the effective assistance of counsel is perhaps the most fundamental right,
because it affects all other rights. Strickland v. Washington,  466 U.S. 668, 685
(1984); Cuyler v. Sullivan, 446 U.S. 335, 344 (1980).  A defendant has been
deprived of the effective assistance of counsel when (1) "counsel's performance
was deficient" and (2) the "deficient performance prejudiced the defense."
Strickland, 466 U.S. at 687.

31.    Strickland mandates that counsel must "act with reasonableness under

prevailing professional norms" as guided by "American Bar Association (ABA) standards and the like." 466 U.S. at 691; <u>Williams v. Taylor</u>, 329 U.S. 362, 396 (2000). In <u>Wiggins v. Smith</u>, 123 S.Ct. 2527 (2003), the Court reiterated that standards, such as the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (1989), are "'guides to determining what is reasonable.'" <u>Id</u>. at 2536 (quoting <u>Strickland</u>, <u>supra</u>, at 688). Among other things, those guidelines provide:

> [C]ounsel must conduct a prompt independent investigation into the guilt and penalty phases of a capital trial, that the investigation should be conducted regardless of any statements or admissions by the client, and that counsel should collect information that includes, but is not limited to the client's: medical history, educational history, family and social history, prior correctional experience, and religious or cultural influences.

ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, § 11.4.1.

32. The standards identified in <u>Strickland</u>, <u>Williams</u>, and <u>Wiggins</u> represent well-defined, common sense precepts followed by competent attorneys in capital cases. "At the heart of effective representation is the independent duty to investigate and prepare." <u>Goodwin v. Balkcom</u>, 684 F.2d 794, 805 (11th Cir. 1982); <u>Code v. Montgomery</u>, 799 F.2d 1481, 1483-84 (11th Cir.1986); <u>House v. Balkcom</u>, 725 F.2d 608, 617-18 (11th Cir.1984). While an attorney may ultimately determine that presentation of some evidence is inappropriate, and that

certain evidence should not be pursued, that decision must "flow from an informed judgment. . . . [O]ur case law rejects the notion that a 'strategic' decision can be reasonable when the attorney has failed to investigate his options and make a reasonable choice between them." Baxter v. Thomas, 45 F.3d 1501, 1514 (11th Cir. 1995). This holds true even if a client informs his counsel that he does not want to present mitigating evidence; counsel is still under a constitutional duty to investigate fully, so as to advise his client fully on the consequences of a decision to forego presentation of the evidence. Rompilla v. Beard, 125 S.Ct. 2456, 2461 (2005); Blanco v. Singletary, 943 F.2d 1477, 1501 (11th Cir. 1991).

### 2. Pre-Trial

33.    Mr. Hunt's trial counsel Louis Wilkinson was not appointed until merely three months before the scheduled trial date of May 14, 1990, and counsel Mr. Hubert Taylor did not accept appointment until May 1, 1990, only three weeks before the scheduled trial.

34.    Mr. Hunt is indigent. His trial counsel were constrained by the shockingly low compensation provided by the State of Alabama to capital defense attorneys for indigent defendants at that time. Alabama Code §15-12-21 (1975) provided a cap of $1,000 for out-of-court work for each phase of the capital trial, based on a rate of $20 per hour for no more than 50 hours of out-of-court work.

Following Mr. Hunt's conviction, §15-12-21 was amended and the fees cap for capital trials was removed. Johnson v. State, 820 So.2d 842, 870 (Ala.Crim.App. 2000), aff'd, 820 So.2d 883 (Ala.2001).

35.    Mr. Hunt's trial counsel conducted virtually no investigation before or during Mr. Hunt's capital trial.  Trial counsel Louis Wilkinson billed a total of 45 hours of out-of-court work preparing for trial–not even the full amount permitted by the statute.

36.    Trial counsel's failure to investigate was total.  Trial counsel never interviewed Mr. Hunt's parents, both of whom are alive; any of his seven siblings or four surviving half-siblings; any other family members; teachers; friends; or employers.  Nor did they obtain any  records documenting Mr. Hunt's life, including school, health, employment or religious records of both Mr. Hunt and his parents and siblings, nor seek expert assistance of any sort to evaluate how Mr. Hunt's circumstances connected to the conduct for which he was charged.  Trial counsel hired an investigator, Jim Bentley, who likewise did none of these tasks, but limited his investigation to speaking to a few fact witnesses.

37.    Trial counsel thus failed to discover a plethora of information about Mr. Hunt's extremely abusive childhood, emotional difficulties, and drug and alcohol abuse that his family members and others could have provided.  For example, they would have learned that Mr. Hunt was born into a family with a

generations-long pattern of sexual and other physical abuse, alcoholism, domestic violence and psychiatric problems, and suffered serious physical abuse in his home such that he and his siblings were made wards of the state. Living in group children's homes where he was beaten as well, Mr. Hunt began abusing drugs during childhood, continuing the drug and alcohol abuse after he was returned from the group homes back to his physically and sexually abusive family.

38.    Trial counsel also did not ever visit the local crime scene, nor interview any fact witnesses who testified at trial. They also never interviewed potential witnesses Stephen Cain and Jimmy Cain, who were held in the same jail as Mr. Hunt, and could have testified about the prosecution's efforts to obtain a "jailhouse informant" to testify against Mr. Hunt.

39.    Nor did trial counsel obtain written statements given to the prosecution by Stephen Cain, describing the prosecution's efforts to solicit testimony against Mr. Hunt, and by Loretta Hunt Martin, the defendant's sister, who testified against him at trial. This failure was inexplicable, as the statements were listed on a discovery log and thus known to trial counsel, and could have provided a basis for impeachment of Ms. Martin and of the prosecution's eventual jailhouse informant, James Sanders.

40.    Since trial counsel never even conducted the investigation required to learn any of this or similar information, they could not have made a strategic

13

decision about whether and how to present it to the jury and trial court. Their

failure to investigate doomed Mr. Hunt, as it left trial counsel with no basis on

which to make a reasonable determination what evidence should be presented to

the jury and trial court.

### 3.    Pre-Trial and Jury Selection

41.    Despite the lack of adequate time to investigate and prepare for a

capital trial, trial counsel failed to seek and adequately argue for adjournments

necessary to give them time to conduct an investigation and prepare.

42.    Although trial counsel once spoke to Mr. Hunt's mother, Ruby

Savage, they only spoke to her briefly and did not interview her to obtain any

information about her son's background. At trial, they called her as a witness

without ever having interviewed her or prepared her to testify.

43.    Mr. Hunt's case had received significant prejudicial media coverage

in the local press, including stories with supposed details of the crime,

inflammatory statements by the District Attorney about Mr. Hunt, and allegations

that Mr. Hunt was the suspect in another violent crime in the community.   Trial

counsel did not adequately pursue or argue a motion for a change of venue.

Although trial counsel moved for a change of venue, they made no efforts to meet

the defense's burden, requesting no evidentiary hearing and failing to submit the

newspaper evidence showing the ample adverse publicity.

44.    Moreover, trial counsel failed to renew its motion during or after voir dire, where numerous jurors admitted that they had been influenced by the pre-trial coverage or had personal knowledge of the crime from the victim's family members or friends.   Their failure is wholly unreasonable, for as the trial court judge stated in the Rule 32 proceedings, these jurors' statements would have been dispositive of a motion for a change of venue:  "I missed all of that, apparently.  If that were all correct, there would have been a change of venue without any question."

45.    Despite the critical role voir dire plays in selecting the kind of fair and impartial jury necessary to make judgments between life and death in a capital case, see Turner v. Murray, 476 U.S. 28 (1986); Gray v. Mississippi, 481 U.S. 648 (1987), trial counsel's voir dire examination of jurors failed to protect Mr. Hunt's rights.  Trial counsel did not "life-qualify" the jury and identify prospective jurors who would be biased in favor of capital punishment or would automatically sentence Mr. Hunt to death. Nor did trial counsel object to the exclusion for cause of prospective jurors who expressed reservations about imposing a death sentence, but could render an impartial guilt phase verdict.  In addition, by asking only limited and leading questions of jurors who admitted they had been influenced by pre-trial coverage or had personal knowledge of the case, trial counsel failed to

15

adduce sufficient information for the intelligent exercise of peremptory challenges, and thus failed to ensure that an impartial jury would be impaneled.   Rosales-Lopez v. United States, 451, 182, 188 (1981).

46.    In addition, Mr. Hunt was constitutionally entitled to consideration by grand and petit juries chosen from a pool that represented a fair cross section of the community.   Duren v. Missouri, 439 U.S. 357 (1979); Taylor v. Louisiana, 419 U.S. 552 (1975); Thiel v. Southern Pacific Co., 328 U.S. 217 (1946). Yet despite the fact that Mr. Hunt's grand jury contained no African-Americans and that his venire panel contained only five African-Americans–clearly not a fair cross section of the relevant community--trial counsel failed to present and adequately argue motions to quash the grand jury and petit jury venires on these grounds.

47.    Nor did trial counsel object when the father of the victim, Mr. W.O. Sanders, was seated next to the District Attorney at jury selection and during opening arguments.

48.    Trial counsel also failed to argue adequately a motion to suppress the physical evidence used against Mr. Hunt, on the grounds that his arrest warrant was unsupported by factual allegations, and was invalid under the Fourth Amendment,  Whitley v. Warden, Wyoming State Penitentiary, 401 U.S. 560, 564 (1971); see Ker v. California, 374 U.S. 23 (1963); Giordenello v. United States,

16

357 U.S. 480 (1958), and therefore the evidence seized should have been suppressed. Mapp v. Ohio, 367 U.S. 643(1961).

    4.    **Guilt Phase.**

    a.    **James Sanders and Loretta Hunt Martin**

49.    Trial counsel failed to object to the prosecution's improper and misleading examination of James Carr Sanders, in which the prosecutor misled the jury into believing that Mr. Sanders had nothing to gain from his testimony.   See ¶¶22-28, incorporated by reference herein.   Trial counsel did not speak to Mr. Sanders at any time outside the presence of the jury, nor make any effort to correct the misimpressions left by the prosecutor.

50.    Trial counsel also failed to conduct an adequate and effective cross-examination of Mr. Sanders, never using his prior convictions or pending charges for impeachment.  At the time of his testimony against Mr. Hunt, Mr. Sanders was a three-time convicted felon, was facing a new charge, and was charged with violating the terms of his probation.  All of the crimes for which he was convicted were crimes of dishonesty and demonstrated his propensity to put his own interests above those of society.  A violation of probation represents a broken promise to the court and a disrespect for the criminal justice system.  Yet trial counsel inexplicably failed to cross-examine Mr. Sanders about the facts underlying any of

his cases, about the terms of his probation, about the facts of his new case, which, together with the probation violation, was pending before the same court and being prosecuted by the same District Attorney as Mr. Hunt's case.   Trial counsel also failed to ask Mr. Sanders questions that would clarify the misimpression left by the prosecutor's direct and re-direct examination that Mr. Sanders was going to serve a minimum of fifteen years in prison regardless of  his testimony against Mr. Hunt.  Due to trial counsel's wholly deficient cross-examination, the jury never learned that at the time of his testimony against Mr. Hunt, Mr. Sanders had an open case before the same court, that he had not yet been convicted, and that the District Attorney's Office on whose behalf he was testifying was still investigating his case and still determining whether and for what to prosecute him.

51.    Trial counsel failed to conduct an adequate and effective cross-examination of Loretta Hunt Martin, Mr. Hunt's sister, who testified that Mr. Hunt had confessed details of the crime to her.  Trial counsel never sought to impeach her credibility or reveal her biases under cross-examination,  such as by cross-examining her about her  romantic relationship with the District Attorney's investigator, Frank Cole, during the investigation and trial.   They also failed to question Ms. Martin effectively about how she ended up disclosing to the prosecutor's office, namely Frank Cole, Mr. Hunt's alleged confession. Specifically, they failed to inquire why Ms. Martin waited over a year before

18

disclosing this alleged confession, nor pointed out that she did not disclose it until another witness, Jack Kilpatrick, had passed away. This point was important because, according to Ms. Martin, Jack Kilpatrick was present during the alleged confessions but, of course, having just recently passed away, was unavailable to rebut her testimony. If such a cross-examination had been conducted, Ms. Martin would have been shown to be a biased and untruthful witness.

        **b.**     **Theory of defense**.

52.     Trial counsel presented an incoherent and sub-standard theory of defense, which itself violated Mr. Hunt's right to the effective assistance of counsel, and which also likely led the jury to believe that Mr. Hunt was guilty. Trial counsel presented conflicting theories of defense of misidentification and lack of intent. Given the presence of physical evidence and testimony from witnesses that would indicate Mr. Hunt had been in an altercation with the victim, it was unreasonable to pursue a defense of misidentification.

53.     Compounding matters, trial counsel also pursued the conflicting defense of lack of intent. In circumstances such as these, the pursuit of conflicting defenses is itself prejudicial in that there may be a significant danger that the conflict alone would lead the jury to infer the defendant's guilt. See Torres v. Irvin, 33 F. Supp. 2d 257 (S.D.N.Y. 1998); People v. Mahboubian, 543 N.E.2d 34

(N.Y. 1989).   Moreover, the pursuit of an objectively problematic defense of misidentification together with the more meritorious defense of lack of intent would have misled the jury about Mr. Hunt's guilt.

54.    Trial counsel were wholly unreasonable in failing to pursue a defense based upon intoxication.  First, had trial counsel conducted any investigation, they would have learned of Mr. Hunt's longstanding  history of drug and alcohol use. They also would have learned from his mother and from other witnesses, had they interviewed them, that they would testify that Mr. Hunt was severely intoxicated at the time of the crime.   In the absence of such investigation, trial counsel's failure to pursue this defense cannot be deemed strategic, as they did not have the information on which to make an informed judgment.

55.    In any event, it was further wholly unreasonable for trial counsel to fail to pursue an intoxication defense once the prosecution had introduced substantial evidence that he had been severely intoxicated by cocaine, pills and alcohol when the crime was committed.   This evidence was central to the prosecution's case, from its opening statement claiming that Mr. Hunt had told his sister he had been drinking and taking pills before he got into a fight with Ms. Lane; testimony from prosecution witnesses that Mr. Hunt was drinking and under the influence of cocaine at the time of the crime; and testimony from Mr. Hunt's mother,  Ruby Savage, that Mr. Hunt appeared to have been drinking and was

20

taking pills at the time of the crime.

56.    Given this evidence, trial counsel should have discussed an intoxication defense in his closing statement, and should have requested the court to instruct the jury on intoxication as it related to Mr. Hunt's alleged intent, and should have objected to the trial court's failure to give such an instruction.   The court must instruct a jury on intoxication whenever there is evidence presented at trial from which the jury could entertain a 'reasonable doubt" on the element of intent.  <u>Fletcher v. State</u>, 621 So. 2d 1010, 1019 (Ala. Cr. App. 1993).  This is so, even though "the defendant denies the commission of the crime and . . . the evidence of intoxication is offered by the State."  <u>Id.</u> (citations omitted). Moreover, "it is clear that where there is evidence of intoxication, the extent to which the accused is intoxicated is a question to be decided by the jury."  <u>Id.</u> at 1020-21.   Had trial counsel requested the instruction, the court was obligated to give it, and the jury would have been permitted to consider powerful evidence that negated intent.

### c.    Instructions

57.    Trial counsel were further inexcusably deficient in failing to request other jury instructions to which Mr. Hunt was entitled, and which would have permitted the jury to convict him of charges less than capital murder, and failing to

object when the court did not give the jury such instructions. "It is clear that '[a] defendant is entitled to a charge on a lesser included offense if there is any reasonable theory from the evidence that would support the position.'" <u>Fletcher v. State</u>, 621 So. 2d at 1019 (quoting <u>Ex parte Oliver</u>, 518 So. 2d 705, 706 (Ala. 1987)). This is true "regardless of 'however weak insufficient, or doubtful in credibility' the evidence concerning that offense." <u>Id.</u> (quoting <u>Chavers v. State</u>, 361 So. 2d 1106, 1107 (Ala. 1978)). In fact, "[w]hen there is evidence that would support a charge on a lesser included offense, the defendant is entitled to the charge 'even where 'the defendant denies the charge,' <u>Ex parte Pruitt</u>, 457 So. 2d 456, 457 (Ala. 1984), and [where] 'the evidence supporting the defendant's position is offered by the State.'" <u>Fletcher</u>, 621 So. 2d at 1019 (quoting <u>Silvey v. State</u>, 485 So. 2d 790, 792 (Ala. Cr. App. 1986)). Moreover, "'it is much the safer rule to charge upon all the degrees of homicide included in the indictment, when a party is on trial for murder, unless it is perfectly clear to the judicial mind that there is no evidence tending to bring the offense within some particular degree.'" <u>Id.</u> at 1021 (quoting <u>Phelps v. State</u>, 435 So. 2d 158, 163 (Ala. Cr. App. 1983)). As noted by the Court of Criminal Appeals, intoxication and manslaughter as a lesser included offense are interrelated. <u>Id.</u> at 1019.

58.    Here, given the substantial evidence that Mr. Hunt was under the influence of alcohol, pills, and cocaine when the crimes were committed, trial

counsel should have asked the court to charge the jury on the lesser-included-offense of manslaughter under each count of the indictment, and should have objected to the court's failure to do so.  Had defense counsel requested the Court so to instruct the jury, the Court would have been bound to do so; and had the jury been so instructed, there is a reasonable probability that it would have convicted Mr. Hunt of manslaughter instead of capital murder.

59.    Trial counsel also should have requested an instruction on the lesser-included offense of felony-murder for counts one and two of the indictment, and should have objected to the court's failure to give such an instruction.  The prosecution's theory was that Ms. Lane was murdered in connection with attempted  sexual abuse.   There was certainly a reasonable view of the evidence from which the jury could have concluded that Mr. Hunt caused Ms. Lane's death during the commission of the alleged sexual abuse, but that, even aside from the issue of intoxication, he simply lacked the specific intent to cause Ms. Lane's death.  Such a view is supported by the testimony of several prosecution witnesses, including testimony from several witnesses about Mr. Hunt's efforts to call the police and medical assistance for Ms. Lane.

60.    Moreover, unlike cases in which the victim is shot through the heart or the head or cases in which words indicating a specific intent to kill are uttered before, during, or even after the incident, here there was no shooting, no stabbing,

23

no confession or other utterance evidencing a specific intent by Mr. Hunt to kill Ms. Lane. In fact, by all accounts it seems that Mr. Hunt himself summoned medical attention for Ms. Lane.

61. The lesser-included charge of murder, which was submitted by the court, was not distinguishable from the capital-murder charge on the issue of intent to kill. Thus, a juror convinced beyond a reasonable doubt that Mr. Hunt caused Ms. Lane's death and that he committed sexual abuse against Ms. Lane, but who was not convinced beyond a reasonable doubt that Mr. Hunt intended to cause Ms. Lane's death, a defense supported by a reasonable view of the evidence, could not have rendered a verdict consistent with that reasonable view of the evidence without acquitting Mr. Hunt outright, something any jury would have been unwilling to do. See Beck v. Alabama, 447 U.S. 625 (1980). Counsel's failure to request the felony-murder instruction, and object to the absence of such an instruction, as a lesser-included offense under counts one and two of the indictment was objectively unreasonable.

62. Finally, trial counsel should have requested the court to instruct the jury on the charge of abuse of a corpse as a defense to capital murder under counts one and two of the indictment. Substantial testimony adduced at trial showed that, if any sexual abuse occurred at all, it may have occurred after the victim's death. Thus, there was a reasonable view of the evidence that the intent to commit any

24

alleged sexual abuse arose after the victim's death.  Accordingly, defense counsel should have requested an instruction on abuse of a corpse as a defense to capital murder under counts one and two of the indictment.  See Padgett v. State, 668 So. 2d 78, 83-85 (Ala. Crim. App. 1995).

d.    **Sufficiency of evidence of capital murder**

63.    Trial counsel failed to object and argue adequately that the evidence was legally insufficient to support Mr. Hunt's capital-murder convictions and death sentences.

64.    In Alabama, a capital murder is an intentional murder without legal provocation and including one of the elements of Alabama Code § 13A-5-40(a). Ex parte Murry, 455 So. 2d 72 (Ala. 1984), on remand 455 So. 2d 82.  With respect to each count, the evidence failed to establish beyond a reasonable doubt that Mr. Hunt intended to cause Ms. Lane's death.   There was no evidence of such intent, and indeed, the prosecution's own witnesses established that Mr. Hunt did *not* intend to kill Ms. Lane.  Nevertheless, trial counsel failed to argue sufficiently to the court and the jury that there was not sufficient evidence to prove beyond a reasonable doubt that Mr. Hunt intended to kill Ms. Lane.

65.    Second, trial counsel failed to argue sufficiently to the court and the jury that there was insufficient evidence to convict Mr. Hunt of capital murder

25

under Ala. Code § 13A-5-40(a)(4). Under that section, capital murder is committed when a person intentionally causes the death of another person during the commission of a burglary in the first or second degree. Ala. Code § 13A-5-40(a)(4). To be guilty of burglary in the first degree, a defendant must enter or remain unlawfully in a building or dwelling with the intent to commit a crime therein and cause physical injury to someone who is not a participant in the crime. See Ala. Code §§ 13A-7-5(2), 13A-7-6(2). The indictment in this case specifically alleged that the crime Mr. Hunt intended to commit in the course of burglary–and therefore the underlying crime giving rise to capital murder– was sexual abuse in the second degree.

66. Even assuming that there was sufficient proof that Mr. Hunt unlawfully entered Ms. Lane's apartment, there was plainly not sufficient evidence to prove beyond a reasonable doubt that Mr. Hunt intended to commit any crime at the time he entered, and there was *no* evidence whatsoever that he entered the apartment with the intent to commit sexual abuse in the second degree. Yet trial counsel failed to argue adequately to the court and jury that the evidence was insufficient to convict Mr. Hunt of capital murder under count three of the indictment. Defense counsel's failure was objectively unreasonable.

67. In addition, trial counsel failed to argue adequately to the court and the jury that the evidence was not sufficient to prove beyond a reasonable doubt

that Mr. Hunt was guilty of capital murder during the commission of sexual abuse

under counts one and two of the indictment.  If the intent to commit sexual abuse

arose after the victim's death, then there could be no forcible compulsion, nor

would the victim be merely "physically helpless," and, thus the crime would be

abuse of a corpse, not sexual abuse.  See Padgett v. State, 668 So. 2d 78, 84-85

(Ala. Crim. App. 1995).  Yet the prosecution's own witness concerning alleged

sexual abuse testified that any sexual abuse to the victim's mouth could have

occurred after her death.  And there was *no* evidence to show that she had been

sexually abused with a broomstick prior to her death, and the state's own medical

expert opined that there were no signs of sexual abuse to the genital area.  Yet trial

counsel failed to argue adequately that the evidence was insufficient to prove

beyond a reasonable doubt that Mr. Hunt was guilty of capital murder during a

sexual abuse under counts one and two of the indictment.

### e.    Additional guilt phase issues.

68.    Trial counsel's guilt phase presentation in Mr. Hunt's defense was

thoroughly deficient, replete with statements that were prejudicial to Mr. Hunt and

had no possible salutary effect on his defense.   Counsel's opening and closing

arguments were so poor, rambling, and incomprehensible as to render the

assistance of counsel ineffective, and deny Mr. Hunt the competent, vigorous

advocacy to which he was entitled. The jury, likewise, was left with only confused, inaccurate theories of the case and the law.

69.     Trial counsel's deficient closing argument included utterly incoherent arguments such as, "I understand that there is sex, seemingly apparent, in the pictures and in that factor but what I am talking about or asking you ladies and gentlemen to consider, is sex killing. Not sex and murder or murder and sex as Mr. Adair said. But sex and murder, which is, of course, very different. And I expect the judge will tell you that it is a sex/murder which is a capital offense. The underlying is sex/murder." (R. 841.) Such a poorly prepared and delivered closing argument prejudiced Mr. Hunt's ability to receive a fair trial.

70.     Trial counsel further worked against Mr. Hunt's interests, and denied him effective representation, by telling the jury that the prosecutors and their investigative team had done a great job in this case. This added credibility to the prosecution as a whole and to the prosecutors and their investigators specifically. Trial counsel abdicated their responsibility to act singlemindedly on behalf of Mr. Hunt as an adversary of the State. Trial counsel were also ineffective for telling the jury that "It's much easier for me to represent the interest of my client, knowing it is my duty." Counsel thus distanced himself from his client and gave the jury the distinct impression that he was representing Mr. Hunt because he had no choice.

71.    Trial counsel further made prejudicial and inflammatory arguments to the jury suggesting, rather than denying, Mr. Hunt's guilt in a capital murder, stating that the state's evidence "would lead you [the jury] to say the only possible conclusion is that this was a sexual killing."  Trial counsel further misled the jury concerning the nature of their duty in deliberating the guilt phase of the trial, repeatedly suggesting their task was to determine "what is the truth," rather than to determine whether the prosecution has proved his guilt beyond a reasonable doubt.

72.    These comments, especially when taken together demonstrate a clear breakdown in the adversarial system.  Mr. Hunt's attorney went from vouching for the prosecution to denigrating his own client and defense.  This clearly violated Mr. Hunt's rights to a fair trial, due process, reliability in sentencing, and effective assistance of counsel.

73.    Trial counsel failed to object to the numerous instances of prosecutorial misconduct and improper, prejudicial statements made by the prosecuting attorney during his opening and closing statements and examination of witnesses.  These statements, to which trial counsel should have objected but did not, included comments about Mr. Hunt's failure to testify; about plea bargaining; comments about Mr. Hunt's  future dangerousness; arguments about highly prejudicial facts not in evidence; improper appeals to jury sympathy; and expression of personal opinion.  See ¶¶171-77; 186-216 , incorporated by

reference herein.

74.    Trial counsel failed to object  to the trial court's erroneous

instructions on reasonable doubt and the presumption of innocence.  By

misdefining "proof beyond a reasonable doubt" in terms such as proof "to a moral

certainty"; proof beyond a "doubt for which a good, sound, sensible person could

give a reason"; "an abiding conviction that Mr. Hunt here is guilty"; and other

similar language, the trial court's instructions at the guilt phase impermissibly

diminished the State's burden of  proof.  This invited the jury to convict Mr. Hunt

on a lesser degree of proof than constitutionally required, and undermines

confidence in the jury's verdict.  Cf. Sullivan v. Louisiana, 508 U.S. 275, 281-82

(1993).

75.     Trial counsel failed to object to introduction of inflammatory,

prejudicial evidence, including photographs of the victim, and a note pad and

some sketches introduced through witness Jean Kilpatrick.   While apparently the

prosecution had intended to show that the sketches were done by Mr. Hunt, the

only evidence showed that they actually were made by the witness's husband, Jack

Kilpatrick.   The sketches were both prejudicial and irrelevant and not probative of

any matter in the case, and trial counsel should have objected to their admission.

76.    The Alabama Court of Criminal Appeals and the Alabama Supreme

Court had a duty to review the full transcript for error. In addition, the Alabama

rules of Criminal Procedure require that in a capital case the reporter "shall take full stenographic notes of <u>voir dire</u> of the jury and arguments of counsel." Ala. R. Cr. P. 19.4(a). Many portions of the proceedings at Petitioner's trial were not transcribed, including bench conferences on issues raised by defense, prosecution and the Court, and exercise of peremptory challenges. In some instances only portions were transcribed. Significantly, proceedings which were not transcribed included off-record colloquy between trial counsel and the Court. Trial counsel were ineffective for failing to ensure that a complete and accurate record was made.

5.    **Penalty Phase.**

  a. **Mitigating evidence**

77. "It is undisputed that [defendants have] a right, indeed, a constitutionally protected right to provide the jury with . . . mitigating evidence." The role of a lawyer at the penalty phase is to humanize his or her client. A capital defendant is constitutionally entitled to introduce during the penalty phase of trial evidence of mitigating circumstances. <u>See</u> <u>Lockett v. Ohio</u>, 438 U.S. 586, 604 (1978) (death penalty schemes must allow jury to consider "*as a mitigating factor, any aspect of the defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.*")

31

(emphasis added).

78.      In Alabama, the sentencer "has unlimited discretion to consider *any*
perceived mitigating circumstances . . . ." <u>Ex parte Clisby</u>, 456 So. 2d 105, 108
(Ala. 1984), <u>vacated on other grounds</u> 920 F.2d 720 (11th Cir. 1991).   The penalty
and sentencing hearings before the jury and the judge are thus the most critical
stages in Alabama capital cases, at which effective and zealous advocacy is
required.  Yet Mr. Hunt's counsel offered him virtually no assistance whatsoever at
what should have been the final battle to save his life.

79.      The entire penalty phase of Mr. Hunt's trial amounts to fewer than
five and a half pages of a transcript.  Trial counsel presented *no* witnesses and put
on *no* evidence.  The entire penalty phase consisted of a rambling, equivocal
statement by Mr. Hunt's trial counsel.

80.      Trial counsel's failure to investigate *any* mitigation evidence–either
before trial or during the guilt phase of the trial--doomed Mr. Hunt at the penalty
phase.  In <u>Wiggins</u>, the Supreme Court, citing ABA Guidelines, held that "[t]he
investigation for preparation of the sentencing phase...should comprise efforts to
discover <u>all reasonably available</u> mitigating evidence." 123 S.Ct. at 2537, quoting
ABA Guidelines § 11.4.1 (c), p. 93 (emphasis in original).  Among the types of
evidence that counsel should consider presenting are "medical history, educational
history, employment and training history, <u>family and social history</u>, prior adult and

32

juvenile correctional experience, and religious and cultural influences). *Id. quoting* ABA Guidelines § 11.8.6, p. 133 (emphasis in original); Blake v. Kemp, 758 F.2d 523, 533 (11th Cir.) ("It should be beyond cavil that an attorney who fails altogether to make any preparations for the penalty phase of a capital murder trial deprives his client of reasonably effective assistance of counsel by any objective standard of reasonableness"); Harris v. Dugger, 874 F.2d 756, 763 (11th Cir. 1989) (counsel ineffective for failing to investigate, prior to sentencing, defendant's "family, scholastic, military and employment background"). Here, counsel's performance fell far short of those standards.

81.    Even a minimally adequate investigation would have revealed a wealth of mitigating circumstances which, had they been presented to the jury and court, reasonably may have resulted in a lesser sentence.  Among the facts that the jury never got to hear and consider due to counsel's ineffectiveness are the following:

82.    Mr. Hunt was born in 1960 in Miami, Florida into a family with a generations-long history of violence, sexual abuse and alcoholism.  He was one of eight siblings, and six half-siblings, one of whom committed suicide.  His alcoholic mother, who had been abused herself as a child and taken from her parents' home, married his alcoholic father when she was 16, and suffered serious physical abuse at his hands.  Mr. Hunt's father also severely beat Mr. Hunt and his

siblings, and on one occasion performed at-home surgery with a knife on Mr. Hunt's leg rather than permitting him to go to a hospital.  Mr. Hunt and his brothers also had to watch as their father masturbated over their 8 year old sister.

83.    Eventually, the Hunt children became wards of the State and were sent to live in various Florida group homes in the late 1960s.   The homes were extremely restrictive, with the children subjected to strip-searches and receiving few visits from family.   Indeed, their mother did not even visit them their first year.   When the state home closed, Mr. Hunt was sent to various religious-affiliated group homes, where the children were physically and sexually abused, and Mr. Hunt was whipped in front of other children.  His school records from the time show a low IQ and poor cognitive skills and achievement.

84.    Mr. Hunt began smoking tobacco at age 7, and using other drugs at age 10.  By the time he was 13, he was abusing PCP, marijuana, and alcohol, sniffing glue and transmission fluid, and suffering extreme changes in behavior under the influence of drugs.  Eventually, his drug abuse landed him in a medical facility in serious condition from a crack overdose.

85.    At various times, Mr. Hunt was returned to his mother's home in violent projects, where the abuse continued.  Ms. Savage drank heavily and suffered nervous breakdowns for which she received shock therapy and anti-depressants, which she mixed with alcohol.  She married a man who beat her

repeatedly in front of the children, who saw her "bloody" many times.  The young

boys would have to hear and sometimes see their mother have sex with their step-

father, who spent some time in jail during this period and  tried to molest their

younger sister. Like some of his siblings, Mr. Hunt ran away from home by age

13, living in trailers or the projects.  When he would spend some time with his

father, he continued to be abused.  He never finished high school.

86.    In spring 1988, Mr. Hunt moved to Walker County to live with his

mother and step-father. Those who knew him stated that he had a drug problem,

and when intoxicated, would lose his head.  At the time of his arrest, he was

employed by the Martin K. Eby Construction Company.

87.    Had trial counsel discovered these and other mitigation facts and

presented even a fraction of them to the jury, there is a reasonable probability that

the jury may not have recommended that Mr. Hunt be sentenced  to death.   The

State argued that there existed two aggravating factors.  Yet even in the absence of

mitigation evidence, at least one juror voted for life imprisonment rather than

death.   Had counsel presented any mitigation evidence, there is a reasonable

probability that additional  jurors would have found and weighed the aggravating

and mitigating circumstances differently, and opted for a lesser sentence. Because

the court was obligated by law to give weight to the jury's recommendation, the

ultimate sentence may have been different.  Harris v. Alabama, 513 U.S. 504, 512-

13 (1995); <u>Williams v. Taylor</u>, 592 U.S. at 394-96; <u>Jackson v. Herring</u>, 42 F.3d at 1367-68.

88.    In making its sentencing determination, the trial court found that there were two aggravating circumstances, but only one mitigating circumstance. Although the trial court cited to the testimony of Mr. Hunt's mother, Ms. Savage, from the guilt phase, and had access to the pre-sentence report with some information about Mr. Hunt's background, the court stated clearly that it "merely addresse[d] this testimony and [did] not consider such as a mitigating circumstance." There is a reasonable probability that, had defense counsel investigated and actually presented mitigation evidence, the court would have found that there were additional mitigating circumstances and that those mitigation circumstances were sufficiently weighty to preclude imposition of death. Counsel's failure to investigate and present such evidence therefore denied Mr. Hunt effective assistance of counsel. <u>Williams v. Taylor</u>, 592 U.S. at 394-96; <u>Jackson v. Herring</u>, 42 F.3d at 1367-68; <u>Blanco v. Singletary</u>, 943 F.2d at 1504; <u>Blake v. Kemp</u>, 758 F.2d at 534-35.

89.    Although trial counsel suggested that impairment by drugs or alcohol could be considered a mitigating factor, counsel neither presented nor referred to evidence that Mr. Hunt was so impaired.   Such evidence had been adduced in the guilt phase, and was highly probative in the mitigation phase as well, as the jury

was obligated to consider drug and alcohol impairment as a mitigating circumstance. <u>See</u> <u>Booker v. Dugger</u>, 922 F.2d 633 (11th Cir. 1991).

   **b.    Failure to object to rushed proceedings**

   90.    Trial counsel was further ineffective for failing to object to proceeding immediately to the penalty phase after the guilt phase, failing to seek a continuance at several instances in the proceedings, and failing to object to prejudicial statements by the trial court that encouraged the jury to engage in rushed deliberations.

   91.    After the jury had returned its guilty verdict, the court asked the jurors: "[D]o we want to take a break for supper or come back tomorrow? Take a break for supper, and do this, <u>and finish tonight</u> or come back tomorrow?" The trial court then said the penalty phase would take only "a couple of hours." After a brief recess, the penalty phase began at 8:00 p.m..

   92.    After the extremely brief penalty phase, and before sending the jury into deliberations, the trial court stated to the jury, "Ladies and gentlemen of the jury, I know you are tired. I am, too. I'm going to give you jury instructions with regard to the sentencing hearing." The jury returned an 11-1 recommendation for death that same evening.

   93.    Trial counsel did not object to these statements, individually or

37

cumulatively; nor object to commencing a penalty phase at 8:00 p.m.; nor seek a

recess or continuance; nor object to submitting a capital case to a "tired" jury

rather than seeking a recess.  This was wholly unreasonable.  Given that trial

counsel had not prepared at all for the penalty phase, a continuance was necessary

to obtain and prepare mitigation evidence.  It was also foreseeable that the penalty

phase presentation--the most critical proceeding in a capital case--could take

longer than one evening, and even more so, that considered deliberations in a 3-

count capital case could take several hours.  Furthermore, jurors may reasonably

have interpreted the court's comments about being "tired' and "finish[ing]

tonight" as encouragement to hasten  their deliberations.  The court's comments

unfairly suggested to the jury that their role in the sentencing process was

unimportant and, therefore, gave the jury a diminished sense of responsibility.

Caldwell v. Mississippi, 472 U.S. 320 (1985).

>    c.    **Counsel's argument**

94.    Given the failure to put on any mitigation evidence, the jury and trial

court's choice between life and death rested *entirely* on trial counsel's argument

why his life should be spared.   Trial counsel's performance was objectively

unreasonable.  Trial counsel made comments diminishing the jury's sense of

sentencing responsibility (adding weight to the trial court and prosecution's

comments to the same effect, to which trial counsel did not object).   On several occasions, trial counsel improperly misinformed the jury that it could choose whether or not to consider several potential mitigating circumstances, when in fact the jury and court are <u>obligated</u> to consider any relevant mitigation evidence. <u>Hitchcock v. Dugger</u>, 481 U.S. 393 (1987).

95.    Trial counsel further prejudiced his own client's case by pointing out to the jury and the court that Mr. Hunt had not taken the stand to testify.  Such commentary is forbidden when made by the State or court, <u>Griffin v. California</u> , 380 U.S. 609 (1965), and is no less permissible or explicable when made by defense counsel, as the jury may make negative inferences from the defendants' failure to testify.

96.    Trial counsel encouraged the jury to draw highly prejudicial inferences by stating that "the only person here in the whole county, I guess, who testified 'for Greg Hunt', or was willing to, was his mother."  This statement could have had no conceivable salutary effect on Mr. Hunt's penalty phase presentation; rather, it invited the jury to draw a negative inference from the absence of witness testimony.  Considering that trial counsel did not interview or discover other witnesses, this comment is particularly egregious.

97.    Trial counsel inexplicably equated the sentence of life without parole

with death, telling the jury several times that they were roughly equivalent, and that their choice was "a delayed death sentence or something quicker." Given counsel's equivocal-at-best advocacy for a life sentence, anybody who was inclined to show mercy on Mr. Hunt may likely have instead decided to vote for death. Nor did trial counsel tell the jury they should not impose death, but rather equivocated, suggesting that "it would be . . . <u>maybe</u> the right thing to do to recommend life without parole"; and that "I think <u>maybe</u> it [imposition of life sentence] is the right thing to do." Counsel's equivocal advocacy conveyed to the jury that even Mr. Hunt's counsel could not strongly articulate reasons that Mr. Hunt should not be sentenced to death.

### d.    Prosecutorial misconduct.

98.    Having failed to put on virtually any penalty phase case at all, trial counsel then failed to subject the prosecution's case to adversarial testing, and failed to object to critical errors by the trial court that denied Mr. Hunt a fair trial and a reliable sentence.

99.    Trial counsel was ineffective in failing to object to prosecutorial misconduct during the penalty phase as set forth in ¶¶204-216, incorporated by reference herein.

100.    Trial counsel was ineffective in failing to object to the prosecution

and trial court's statements that improperly diminished the jury's sense of responsibility, as set forth in ¶¶171-77, incorporated by reference herein.

e.    **Jury instructions and verdict.**

101.   Trial counsel was ineffective in failing to object to the trial court's inaccurate jury instructions on inapplicable mitigating circumstances, as set forth in ¶143, incorporated by reference herein.

102.   Trial counsel was ineffective in failing to object to the trial court's jury instructions that were incorrect, misleading and confusing, as set forth in ¶¶157-66; 171-77, incorporated by reference herein.

103.   Trial counsel was ineffective in failing to object when the trial court gave the jury a verdict form containing only a death recommendation at the penalty phase, as set forth in ¶¶144-46, incorporated by reference herein.

104.   Trial counsel was ineffective for failing to object to the jury's failure to specify the aggravating and mitigating factors  it found and on which  it based its recommendation, as set forth in ¶¶217-18, incorporated by reference herein.

f.    **Other penalty phase issues.**

105.   Trial counsel were deficient for agreeing to have all of the guilt-phase evidence automatically admitted as evidence in the penalty phase.  In the penalty phase, the jury had only two aggravating factors before it. But the guilt-phase

evidence went far beyond those two factors, and thus was overwhelmingly irrelevant to the penalty phase, and prejudicial to Mr. Hunt. Trial counsel's decision greatly enhanced the chances that the jury unlawfully considered and found non-statutory aggravating factors arising out of the guilt-phase evidence, and was wholly unreasonable.

### 5.    Sentencing Hearing

106.    The trial court held a sentencing hearing on June 27, 1990 in order to decide whether Mr. Hunt should be sentenced to death or life. The trial court invited defense counsel to make argument. Amazingly, trial counsel declined–even though this proceeding determined their clients' fate.

107.    Nor can trial counsel's silence at the sentencing hearing be deemed strategic, as trial counsel conducted absolutely no preparation for the sentencing hearing. Had counsel adequately prepared and investigated the case either initially, during trial, or during the two weeks between the trial and the sentencing hearing, counsel could have presented to the court a plethora of arguments that may have spared his client's life.

108.    Even without the investigation, trial counsel could have marshaled the available evidence, or attempted to cure defects in the trial, in order to persuade the court that Mr. Hunt should receive a life sentence. For example, the

Pre-Sentence Report prepared by the State made plain on its face several mitigating factors, including Mr. Hunt's extremely abusive childhood, resulting in him becoming a ward of the state; his experience in children's group homes; and his early drug and alcohol abuse. But counsel did not make use of this information or offer any argument at all. As a result, the trial court sentenced Mr. Hunt to death.

109.   Trial counsel further did not object to the trial court's failure at the sentencing phase to consider the non-statutory mitigating evidence that was before the court, as set forth in ¶¶148-59, incorporated by reference herein.

110.   Counsel also failed to object to the imposition of the death penalty in this case as disproportionate and discriminatory punishment under state and federal law.

111.   Counsel also failed to properly object to the method of execution. Alabama's method of execution is unconstitutional. The state seeks to execute Mr. Hunt by subjecting him to torture, suffering and mutilation. Under the Eighth Amendment states must take all feasible steps to minimize the risk of cruelty in administering capital punishment. Zant v. Stephens, 462 U.S. 862 (1983). Alabama's method of execution is unconstitutional on its face and as applied to Mr. Hunt. Trial counsel's failure to object adequately to the manner of execution

constituted deficient performance and prejudiced Mr. Hunt.

112.   Counsel also did not argue that the cumulative impact of the sentencing errors violated due process and rendered the trial and sentence unreliable.  Ex parte Tomlin, 540 So.2d 668 (Ala. 1988); Berger v. United States, 295 U.S. 78, 88 (1935).

113.   Counsel's repeated failure to lodge timely and proper objections limited many of Mr. Hunt's claims to plain error review.   Had the proper objections been made, they would have been reviewed on direct appeal under a less stringent standard and would have resulted in a reversal of Mr. Hunt's conviction and death sentence.

114.   Counsel's ineffectiveness during the pre-trial, guilt, and penalty phases also resulted in insufficient proportionality review.   Had counsel been effective during the guilt phase, they would have established that Mr. Hunt did not have the requisite intent to be guilty of capital murder. Had counsel been effective during the penalty phase, they could have established that there were substantial mitigating circumstances.  Had any of these facts been shown, Mr. Hunt would have received more favorable proportionality review.

### 6.    Appeal and Collateral Review

115.  Mr. Hunt was entitled to forceful advocacy and effective assistance of

counsel at the appellate stage.  Penson v. Ohio, 488 U.S. 75 (1988). Because of

appellate counsel's ineffectiveness, Mr. Hunt was deprived of his right to have his

conviction and death sentence carefully and rationally reviewed, with the benefit

of full briefing and representation by counsel, by the Alabama Supreme Court and

the Alabama Court of Criminal Appeals, as guaranteed by the U.S. Constitution.

116.   Mr. Hunt's trial counsel passed away not long after his trial.  His first

appellate lawyer, Stanley Cohen of New York, filed numerous motions seeking to

obtain or reconstruct their files and correct the record on appeal.  But the trial

court never ruled on all of the motions, and never completed the task of compiling

the correct record for appellate review. Mr. Cohen was replaced on appeal to the

CCA by Julian Massey Relfe. Mr. Gespass and Mr. Izzi represented Mr. Hunt on

appeal the Alabama Supreme Court.

117.   Mr. Hunt's appellate lawyers were ineffective in failing to conduct an

investigation to discover evidence that had not been adduced below.  Mr. Hunt's

appointed appellate counsel did not interview Mr. Hunt's family members, nor

discover the evidence that trial counsel had not investigated.

118.  Appellate counsel were ineffective for failing to research, prepare,

raise, or argue adequately for appellate review the following legal claims:

a.    Brady violations and discovery errors arising therefrom.

45

b.      The trial court's failure to instruct the jury on lesser-included

offenses.

c.      Improper restriction on Mr. Hunt's ability to cross examine a crucial

witness, Mr. James Sanders, the jailhouse cellmate of Mr. Hunt.

d.      All of the substantive legal claims raised in this petition, see ¶¶ 22-

28; 126-231, incorporated by reference herein.

e.      Ineffective assistance of trial counsel, see ¶¶33-114, incorporated by

reference herein.

f.      In the Supreme Court, the ineffective assistance of both trial and

appellate counsel.

119.    In their brief in support of a Petition for *Writ of Certiorari* to the

Supreme Court of Alabama, appellate counsel sought review on only three

substantive errors which occurred at the trial level, *to wit*:

a) the trial court's failure to instruct the jury on voluntary intoxication and

manslaughter as a lesser included offense

b) the trial court's improper restriction on Mr. Hunt's ability to cross

examine a witness.

c) the trial court's improper ruling that the State could introduce testimony

that Mr. Hunt burned the decedent's house down prior to allegedly killing

46

her.

120.    Appellate counsel were further ineffective for failing to ensure that the trial court compiled a complete, accurate record.

121.    Mr. Hunt's appellate counsel submitted completely inadequate briefs to the Alabama Court of Criminal Appeals and the Alabama Supreme Court, based in great part on drafts their client himself had drafted, and without the considered judgment of counsel.

122.    Appellate counsel's failure to raise on direct appeal the issues identified above, other than ineffective assistance of counsel, resulted in the preclusion of those claims in post-conviction proceedings, thereby prejudicing Mr. Hunt, not only on direct appeal but on collateral review.

123.    In Mr. Hunt's post-conviction proceedings, the Alabama state courts also applied an incorrect standard of law in denying his ineffective assistance of counsel claims.  The court erroneously held that, in order to prove he had been prejudiced by counsel's errors, Mr. Hunt was required to introduce extrinsic evidence of prejudice, rather than the trial record itself.  This is patently meritless and contrary to <u>Strickland</u>, especially here, where prejudice is manifest in the trial record.  Indeed, in <u>Wiggins v. Smith</u>,  539 U.S. 510, the Supreme Court stated that in assessing whether the defendant demonstrated prejudice under <u>Strickland</u> "we

47

evaluate the totality of the evidence-'both that adduced at trial, and the evidence

adduced at the habeas proceeding[s].'" Id. at 536 (quoting Williams v. Taylor, 529

U.S. at 397-98).  Thus, it is clear that there need be no extrinsic evidence

presented to prove prejudice, but that a finding of prejudice may be based on an

evaluation of the totality of evidence in the trial or appellate record.  And had they

applied the correct standard, the Alabama courts would have found that Mr. Hunt

had proved his ineffective assistance of counsel claims.

       **g.**    **Conclusion**

124.  Trial and appellate counsel's performance were so deficient that they

were not functioning as "counsel" as guaranteed by the Sixth Amendment to the

United States Constitution.

125.  Individually and cumulatively, counsel's errors deprived Mr. Hunt of

effective assistance of counsel and reliability in sentencing in violation of the

Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States

Constitution.  But for counsel's deficient performance, the outcome of Mr. Hunt's

trial, sentencing hearing, sentencing proceeding, direct appeals and collateral

proceedings would have been different.  Because of counsel's ineffectiveness, Mr.

Hunt was wrongly convicted and sentenced to death.  Strickland, 466 U.S. 668.

The state court resolution of this claim was contrary to, and an unreasonable

application of, clearly controlling precedent of the United States Supreme Court.

Rompilla v. Beard, 125 S.Ct. at 2461; Wiggins v. Smith, 123 S.Ct. 2527; Williams

v. Taylor, 529 U.S. 362; Strickland v. Washington, 466 U.S. 668.

## C.    MR. HUNT WAS DEPRIVED OF A FAIR TRIAL BY AN IMPARTIAL JURY.

126.    Mr. Hunt was deprived of the opportunity to select a fair and

impartial jury because the trial court failed to grant Mr. Hunt's motion for a

change of venue to ensure a jury pool untainted by pretrial publicity.  The trial

court judge in post-conviction proceedings admitted that he should have granted a

change of venue.  Upon reviewing the venire members' statements at voir dire

about the extent to which they had been influenced by pre-trial publicity, the court

stated, "I missed all of that, apparently.  If that were all correct, there would have

been a change of venue without any question."

127.    When pretrial publicity taints a jury pool, the constitution requires a

change of venue.  Irvin v. Dowd, 366 U.S. 717 (1961).  In capital cases there is a

heightened standard of scrutiny for such juror bias.  Id. at 727-28.  The trial court

must grant a change of venue if the "inflammatory, prejudicial pretrial publicity

that so pervades or saturates the community as to render virtually impossible a fair

trial by an impartial jury drawn from that community, [since jury] 'prejudice is

[then] presumed and there is no further duty to establish bias.'"  Coleman v. Zant,

49

708 F.2d 541, 544 (11th Cir. 1983) (quoting <u>Mayola v. Alabama</u>, 623 F.2d 922,997

(5th Cir. 1980).  Where there has been significant prejudicial pretrial publicity, voir

dire is not adequate to protect the accused's right to a fair trial by an impartial jury.

<u>See</u> <u>Coleman v. Kemp</u>, 778 F.2d 1487, 1542 (11th Cir. 1985).  In Mr. Hunt's case,

the trial court committed constitutional error in denying Mr. Hunt's motion for a

change of venue and independently in failing to order a change of venue once trial

was underway and the degree of juror bias became manifest.

128.    In Mr. Hunt's case, the jury pool in Walker County had been tainted

by extensive pre-trial publicity that was highly prejudicial to him.  Numerous

venire members from the panel from which Mr. Hunt's jury was selected admitted

that they had been exposed to pre-trial publicity. Such extensive pre-trial media

coverage so tainted the Walker County jury pool, and Mr. Hunt's own venire, that

it was impossible for him to receive a fair trial in Walker County.  The trial court's

statement that a change of venue should have been granted makes that abundantly

clear.

129.   Mr. Hunt was further deprived of a trial by a fair jury given that

numerous venirepersons testified that they had personal knowledge of the crime

and alleged facts related to the crime from the victim's family or friends.

130.   Mr. Hunt was deprived of the opportunity to select a fair and

impartial jury because the trial court denied his challenges for cause to venire

persons who were prejudicially influenced by pre-trial publicity, who had

prejudicial prior factual knowledge of the case, or who knew the victim or victim's

family. These rulings denied Mr. Hunt the right to a fair and impartial jury

pursuant to the Fifth, Sixth, Eighth and Fourteenth Amendments to the U. S.

Constitution.

131.    Defense counsel's challenges for cause to jurors Childress, Davis,

Benton, Norris and Tidwell should have been granted, as each had prejudicial

prior factual knowledge of the case such that they were incapable of rendering a

fair and impartial verdict.

132.    Mr. Hunt was further denied his right to a fair and impartial jury

because the trial court denied his challenges to cause to jurors who knew the

victim's family or who had independent knowledge about the case. Of the venire

panel, seven jurors knew the husband of the victim on a personal basis. The

court's denial of Mr. Hunt's challenges for cause in a capital case, unfairly

compelled Mr. Hunt to exercise his peremptory challenges to cure the erroneous

for-cause refusal, in violation of his Fifth, Sixth, Eighth, and Fourteenth

Amendments to the U.S. Constitution.

133.    The state court adjudication of these claims was contrary to, and an

51

unreasonable application of, clearly established United States Supreme Court precedent.

**D.    RACE, GENDER AND ECONOMIC DISCRIMINATION IN THE FORMATION AND COMPOSITION OF THE GRAND AND PETIT JURIES, AND THE SELECTION OF RESPECTIVE FOREPERSON, DEPRIVED MR. HUNT OF A FAIR AND RELIABLE TRIAL.**

134.    Mr. Hunt was deprived of his right to a grand jury and a petit jury formed without discriminatory animus, in violation of his rights under Alabama law; the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

135.    Mr. Hunt was also entitled under state and federal law to consideration by grand and petit juries chosen from a pool that represented a fair cross section of the community.  Ala. Code § 12-16-55 (1975); Duren v. Missouri, 439 U.S. 357; Taylor v. Louisiana, 419 U.S. at 552; Thiel v. Southern Pacific Co., 328 U.S. at 217.   Mr. Hunt's grand jury had not a single African-American member.  The 57- member venire panel from which his trial jury was selected consisted of only 5 African-Americans, who totaled 8.7% of the venire panel.  Said percentages do not adequately reflect a fair cross section of the number of African-Americans in the relevant community.  It also was not a fair cross section of the gender of the community, as women were under represented on the venire.

136.    Otherwise qualified citizens were excluded from serving on the grand

52

jury and the petit jury due to a discriminatory system of forming and maintaining

master jury lists in Walker County.  Blacks, women, and poor people were

systematically under represented in the pool from which the grand jury that

indicted Mr. Hunt was selected and from which the jury venire for Mr. Hunt's trial

were selected.

    137.   The actual composition of the grand jury and the petit jury was

motivated by bias, the result of which was  to exclude qualified grand jurors and

venire members solely on the basis of race, gender, or economic status.

    138.   The Grand jury foreperson, including the person chosen to head Mr.

Hunt's grand jury, are selected in Walker County through a subjective decision

making process that permits discrimination.  Such a process deprived Mr. Hunt of

fair proceedings required by law.  <u>Locke v. State</u>, 631 So.2d 1062 (Ala. Cr. App.

1993).

    139.   The state court adjudication of these claims was contrary to, and an

unreasonable application of, clearly established United States Supreme Court

precedent.

**E.**    **GROSS CONSTITUTIONAL ERROR IN THE RUSHED PENALTY
PHASE  DEPRIVED MR. HUNT OF HIS RIGHTS TO A FAIR
TRIAL AND TO DUE PROCESS OF LAW.**

    140.   Mr. Hunt's jury returned its guilty verdict late in the afternoon. The

trial court then asked the jurors: "Ladies and gentlemen of the jury... do we want to take a break for supper or come back tomorrow?  Take a break for supper, and do this, and finish tonight or come back tomorrow?"  When a juror asked how long the penalty proceedings would take, the court informed the jury: "A couple of hours." The judge then sent the jury to a separate courtroom for *them* to decide whether to commence the penalty phase.  The court recessed briefly, and began the penalty phase at 8:00 p.m. that evening.

141.   After the penalty phase, and before sending the jury into deliberations, the trial court stated to the jury, "Ladies and gentlemen of the jury, I know you are tired. I am, too.  I'm going to give you jury instructions with regard to the sentencing hearing."  Later that evening, the jury returned an 11-1 sentence of death.

142.   These statements to the jury, as well as the determination to rush straight into both the penalty phase presentations *and* deliberations that late in the evening, when the court admitted that the jurors and court were tired, were wholly outrageous in a capital trial and individually and cumulatively denied Mr. Hunt of his right to a fair trial, due process, and reliability in sentencing.

143.   In addition, although virtually none of them applied to Mr. Hunt's case, the trial judge instructed the jurors on every single statutory mitigating factor

under Alabama law.  By reading *all* the statutory mitigating factors, it was erroneously implicitly suggested to the jury that the absence of evidence supporting such circumstances was something that would weigh in favor of a death sentence.

144.   The only verdict form provided to the jury prior to their sentencing deliberations was captioned "Jury Recommendation" and stated, "We, the jury, recommend that the defendant, Gregory Hunt, be punished by death  in count one of the indictment.  The vote is as follows," below which was a blank line next to the word, "death," and a blank line next to the words, "life without parole."  The jury received identical forms for counts  two and three.  The jury did not receive any verdict forms recommending life without parole rather than death.  The trial court's penalty phase instructions refer exclusively to "the verdict form," rather than to multiple verdict forms.

145.  At least some jurors may have taken the single verdict form as an indication that the judge favored the death penalty in Mr. Hunt's case or that they were somehow expected to return a death verdict.  The jurors may have construed the single verdict form as an indication that the trial judge's oral instructions, telling them to consider and weigh mitigating circumstances against the aggra-vating factor, were mere surplusage, and that they had been given only one verdict

form because there was  a presumption in favor of death.

146.   The provision of a single "death recommendation" verdict form to the jury in Mr. Hunt's case deprived him of his right to a reliable determination of punishment, and thus violated Mr. Hunt's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

147.   Collectively and individually, these errors in the penalty phase deprived him of his right to a reliable determination of punishment, and thus violated Mr. Hunt's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. The state court adjudication of these claims was contrary to, and an unreasonable application of, clearly established United States Supreme Court precedent.

## F.     THE TRIAL COURT VIOLATED MR. HUNT'S CONSTITUTIONAL RIGHTS BY REFUSING TO CONSIDER MITIGATION EVIDENCE.

148.    At the penalty phase, the trial court failed to consider non-statutory mitigating evidence about Mr. Hunt's extremely traumatic childhood.

149.    In its Sentencing Order, the trial Court addressed non-statutory mitigating circumstances under Ala. Code § 13A-5-52 by stating:

> Testimony adduced from the defendant's mother indicated that he had a childhood which apparently had been wrought with misfortune. He had been placed in foster care in a children's home at a young age but later returned to his mother's custody.  His mother testified that he had a drug problem in his youth. The pre-sentence report included that over a period of

time the defendant had suffered at the hands of an abusive father.

However, the Court merely addressed this testimony and refused to consider it as a

mitigating circumstance.

150.   It was the duty of the trial court not only to allow Mr. Hunt to present

mitigating evidence, but also to give full consideration and weight to all the

mitigating evidence presented on Mr. Hunt's behalf, including evidence which did

not fit within a statutory mitigating circumstance.  See Hitchcock v. Dugger, 481

U.S. 393, 398-99 (1987) (failure of sentencing judge "to consider evidence of

nonstatutory mitigating circumstances . . . renders death sentence invalid").

Accord Penry v. Lynaugh, 492 U.S. 302, 319 (1989); Parker v. Dugger, 498 U.S.

308 (1991).

151.   As correctly noted by the Court in his Sentencing Order, there was

some evidence before the court that Mr. Hunt had a difficult childhood, including

the fact that he had been removed from his family by the State and placed in a

foster home, was later sent to a children's home, had a drug problem, and had an

abusive father.  The evidence referred to by the trial court clearly constituted

mitigation evidence.  See Parker v. Dugger, 498 U.S. 308; Hitchcock v. Dugger,

481 U.S. at 397-99;  Eddings v. Oklahoma, 455 U.S. 104, 114 (1982).  The

sentencer in a capital case can not refuse to consider any, including non-statutory,

mitigating factors. <u>Hitchcock v. Dugger</u>, 481 U.S. 393 at 394; <u>Eddings v. Oklahoma</u>, 455 U.S. at 114; <u>Clisby v. State</u>, 456 So. 2d 99, 101-02 (Ala. Crim App. 1983). Yet, contrary to these established precedents, the trial court expressly refused to consider the evidence of the defendant's difficult childhood as mitigation.

152.   The Court's refusal to give consideration to this mitigating evidence in reaching its sentencing determination violated Mr. Hunt's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. 257.  The state court adjudication of these claims was contrary to, and an unreasonable application of, clearly established United States Supreme Court precedent.

153.   Moreover, the Court apparently failed to consider as a non-statutory mitigating factor that Mr. Hunt was using alcohol and drugs at the time of the offense.  This too was mitigating.  <u>See</u> <u>Parker v. Dugger</u>, 498 U.S. at 308.

154.   Rather, the Court considered such evidence only in relation to enumerated mitigating factor (6), which requires that the alcohol and drug use have such an effect on the defendant that "The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially [impaired]."  <u>See</u> Ala. Code § 13A-5-51(6).

Evidence that Mr. Hunt was under the influence of alcohol and drugs at the time of the crime, however, is itself a mitigating factor, regardless of whether it "substantially impaired" his capacity to "appreciate the criminality of his conduct or to conform his conduct to the requirements of law."  See Parker v. Dugger, 498 U.S. at 314.

155.   The Court nevertheless failed to consider the fact that Mr. Hunt was under the influence of alcohol and various drugs as a non-statutory mitigating factor.  "Under both federal and [Alabama] law, the trial judge could not refuse to consider any mitigating evidence."  Id. at 315.

156.   The Court's refusal to give consideration to this mitigating evidence in reaching its sentencing determination violated Mr. Hunt's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.  The state court adjudication of these claims was contrary to, and an unreasonable application of, clearly established United States Supreme Court precedent.

## G.   THE TRIAL COURT'S ORAL CHARGE AT THE CONCLUSION OF THE PENALTY PHASE OF MR. HUNT'S TRIAL WAS CONSTITUTIONALLY DEFECTIVE AND PREJUDICIAL TO MR. HUNT.

157.   The trial court's instructions to the jury were replete with inaccurate, confusing, incorrect and misleading instructions.

158.   The trial court failed to instruct or properly instruct the jurors that

59

they are required to consider non-statutory mitigating factors in their determination of Mr. Hunt's recommended sentence. The court merely mentions in passing once, "The law of this state provides a list of some of the mitigating circumstances which you may consider but *that list is not a complete list of mitigating circumstances you may consider. I will now read to you the list the law does provide*." However, the court never described to the jurors examples of non-statutory mitigating circumstances they may consider or even defined the term.

159.   The Court's failure to define for the advisory sentencing jury non-statutory mitigating factors, to give examples of non-statutory mitigating factors, or to instruct the jury that there was evidence of non-statutory mitigating factors presented for its consideration precluded the jury from considering the non-statutory mitigating factors, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, see, e.g., Hitchcock v. Dugger, 481 U.S. at 394; Eddings v. Oklahoma, 455 at 114. The state court adjudication of these claims was contrary to, and an unreasonable application of, clearly established United States Supreme Court precedent.

160.   The trial court's penalty-phase instructions to the jury with respect to recommending a sentence of life without parole was misleading and confusing for jurors, because the court failed to clearly specify that it must be based on a vote of

the majority of jurors. The court confusingly instructed: "In order to bring back a verdict recommending the sentence of life without parole, *there must be a concurrence of at least ten of your number* for that sentence. In other words, for life without parole, there is a form here, death--life without parole [sic] . This can not be returned *unless seven jurors vote for life without parole. And, the remainder for death.*"

162. The court's instructions to the jury were so rambling, lengthy, and confusing, that the jury was not adequately or properly prepared to decide the penalty phase of the case. At one point, the court misstated instructions to the jury at the end of the oral charge. The judge confused the instructions on the sentence to be imposed if the jurors found no aggravating circumstances. " If you find that you are not convinced beyond a reasonable, each and every one of you, that a *mitigating* circumstance does exist, you go no further from that point. You sentence to life without parole." The court later admits it "transposed the word mitigating . . . when I should have used the term aggravating" and then corrects its instruction.

162. The court created further jury confusion, which was highly prejudicial to Mr. Hunt, with the following contradictory instruction: "If you are convinced beyond a reasonable doubt that in totality the mitigating circumstances outweigh

the aggravating circumstances, your recommendation of life without parole would

be the proper one . . . In determining mitigating circumstances the burden of proof

is not beyond a reasonable doubt and to a moral certainty as I stated.  It is by the

preponderance of the evidence.  Is that correct?"

163.   Finally, the Court instructed the jury, in violation of the Federal and

State Constitutions and Alabama law, that " . . . if after full and fair consideration

of all the evidence in the case, you determine that mitigating circumstances

outweigh aggravating circumstances that exist, you are not convinced beyond a

reasonable doubt and to a moral certainty that at least one aggravating

circumstance exists, your verdict should be to recommend the punishment of life

without parole and your verdict form should be as follows: 'We, the jury,

recommend the defendant , Greg Hunt, be punished by life imprisonment without

parole and the vote is as follow.'"

164.   In addition, the Court instructed the jury, again in violation of the

Federal and State Constitutions and Alabama law, that "If you are convinced

beyond a reasonable doubt and to a moral certainty that there are–all of you, all

twelve of you, are convinced beyond a reasonable doubt and to a moral certainty,

that there is at least one aggravating circumstance contained here, that it does

exist, you may, upon considering the mitigating circumstances, feel that the

mitigating circumstances outweigh the aggravating circumstances and you may sentence the defendant to life in prison without parole."

165.   In fact, under the circumstances posited by the Court, the jury was required to return a recommendation of life without parole.  Ala. Code §§ 13A-5-46(e)(1), (2) (both sections state that under the circumstances posited, the jury "shall return an advisory verdict recommending to the trial court that the penalty be life imprisonment without parole") (emphasis added); <u>see also</u> Ala. Code § 13A-5-45((f).

166.   Thus, the trial Court's penalty-phase jury instructions violated Mr. Hunt's right to trial by jury, fair trial, reliability in sentencing, and Due process under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.  The state court adjudication of these claims was contrary to, and an unreasonable application of, clearly established United States Supreme Court precedent.

## H.  MR. HUNT'S RIGHTS TO A TRIAL BY JURY, FAIR TRIAL, DUE PROCESS, AND RELIABILITY IN SENTENCING WERE VIOLATED BECAUSE THE ULTIMATE FACTUAL DETERMINATIONS AUTHORIZING THE DEATH PENALTY WERE NOT MADE BY THE JURY BEYOND A REASONABLE DOUBT.

167.   In Alabama, the ultimate determination, and weighing, of aggravating factors authorizing the death penalty is made by the trial judge, not the jury.  <u>See</u>

Ala. Code § 13A-5-47.  The finding of  facts establishing aggravating factors and

the determination that they outweigh the mitigating factors authorizes a much

greater punishment than would be permitted without such a finding.  Indeed,

"death is qualitatively different from a sentence of imprisonment, however long.

Death, in its finality, differs more from life imprisonment than a 100-year prison

term differs from one of only a year or two."  Woodson v. North Carolina, 428

U.S. 280, 305 (1976) (Opinion of Stewart, Powell, and Stevens, JJ.)

Consequently, the facts that establish aggravating factors and thereby authorize a

death sentence must be proved to a jury beyond a reasonable doubt.

168.   In this case, as in every capital case in Alabama, however, the

ultimate finding of those facts was made by the trial judge, not the jury.  This

violated Mr. Hunt's rights to trial by jury, a fair trial, reliability in sentencing, and

Due process under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the

United States Constitution, see Apprendi v. New Jersey, 530 U.S. 466 (2000)(Due

process violation).

169.   Moreover, the Alabama statute allows a jury recommendation of

death not to be unanimous.  See Ala. Code § 13A-5-46(f).  Because the jury must

determine beyond a reasonable doubt whether the facts establish the aggravating

factors and, therefore, authorize a death sentence, the jury's determination must

also be unanimous.  See Apprendi, 530 U.S. at 498, 120 S. Ct. at 2367 (Scalia, J.,

concurring).  The jury that recommended, as opposed to determined, Mr. Hunt's

death sentence made that recommendation by a vote of 11-1.  Moreover, because

the jury was not required to specify the aggravating factors it found, never mind

ensuring that they were found unanimously, it is impossible to determine which

facts it determined were proved beyond a reasonable doubt.  It is therefore also

impossible to determine whether those facts are the same ones used by the trial

court to impose a death sentence.

170.   For these reasons too Hunt's death sentence was obtained in violation

of his rights to a trial by jury, a fair trial, reliability in sentencing, and Due process

under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States

Constitution.  The state court adjudication of these claims was contrary to, and an

unreasonable application of, clearly established United States Supreme Court

precedent.

**I.   COMMENTS BY THE TRIAL COURT, DEFENSE COUNSEL, AND THE PROSECUTOR, INDIVIDUALLY AND COLLECTIVELY, IMPERMISSIBLY DIMINISHED THE JURY'S SENSE OF RESPONSIBILITY FOR SENTENCING.**

171.   The trial court, defense counsel, and prosecutor, individually and

collectively, lessened the jury's sense of responsibility for sentencing.  The United

States Supreme Court's "Eighth Amendment jurisprudence has taken as a given

that capital sentencers would view their task as the serious one of determining

whether a specific human being should die at the hands of the State." Caldwell v.

Mississippi, 472 U.S. at 329.

172.  In Alabama, following a conviction of a capital murder, the jury

renders an advisory sentence to the trial court.  See Ala. Code §§ 13A-5-46; 13A-

5-47.  The Court, however, is required by law to give the jury's recommended

sentence consideration.  See Ala. Code § 13A-5-47(e); see also Harris v. Alabama,

513 U.S. 504, 506 (1995).

173.  During the penalty phase of the trial, the Court, defense counsel, and

the prosecutor impressed upon the jury that its sentence determination was merely

a recommendation and that the ultimate sentencing determination would be made

by the judge.  Not even once was the jury informed of the significance of its

recommendation.  That is, the jury was never informed that the court, in making its

sentencing determination, was required by law to take into consideration the jury's

recommendation.

174.  The comments by the court, defense counsel, and the prosecutor

presented an "intolerable danger of bias toward a death [recommendation and]

sentence."  Caldwell, 472 U.S. at 332.

175.  The impermissible comments, therefore, violated Mr. Hunt's rights to

a trial by jury, a fair trial, reliability in sentencing, and Due process under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

176.   Moreover, this constitutional violation renders the jury's recommendation an impermissible and invalid consideration for the Court in reaching its sentence determination.

177.   Thus, the Court's ultimate death sentence was rendered in violation of Mr. Hunt's rights to a trial by jury, fair trial, reliability in sentencing, and Due process under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. The state court adjudication of these claims was contrary to, and an unreasonable application of, clearly established United States Supreme Court precedent.

**J.    THE ALABAMA CAPITAL-SENTENCING SCHEME IS UNCONSTITUTIONAL, IN THAT IT REQUIRES THE PROSECUTION TO DISPROVE THE EXISTENCE OF MITIGATING FACTORS BY ONLY A PREPONDERANCE OF THE EVIDENCE.**

178.   Under Alabama Code § 13A-5-45(g), the State is required to disprove any mitigating circumstance proffered by the defendant by only a preponderance of the evidence.

179.   The statute's failure to require mitigating circumstances to be

disproved by the State beyond a reasonable doubt renders it unconstitutional, as it violates Mr. Hunt's rights to a trial by jury, fair trial, reliability in sentencing, and due process under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. The state court adjudication of these claims was contrary to, and an unreasonable application of, clearly established United States Supreme Court precedent.

**K.    ALABAMA CODE § 13A-5-45(e) IS UNCONSTITUTIONAL INSOFAR AS IT DENIED MR. HUNT THE RIGHT TO REBUT AT THE PENALTY PHASE THE AGGRAVATING CIRCUMSTANCE THAT THE CAPITAL OFFENSE WAS COMMITTED DURING A BURGLARY.**

180.   Alabama Code § 13A-5-45(e) is unconstitutional, in that it precluded Mr. Hunt from presenting evidence in rebuttal of an aggravating circumstance. According to Alabama Code § 13A-5-45(e), "At the sentence hearing the state shall have the burden of proving beyond a reasonable doubt the existence of any aggravating circumstances.  Provided, however, any aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purpose of the sentence hearing."  Ala. Code § 13A-5-45(e).  This section is unconstitutional for several reasons.

181.   First, it places an unconstitutional burden on the defendant's exercise of his right to remain silent at the guilt phase of the trial, for under the statute the only time the defendant can present evidence, through his own testimony or otherwise, to rebut the aggravating factor is at the guilt phase.  The defendant is either penalized at the penalty-phase for not testifying at the guilt phase, by losing all rights to rebut the aggravating factor, or he is effectively coerced into surrendering his constitutional right to remain silent at the guilt phase and testifying, even though he may have a myriad of legitimate reasons for wanting to exercise that constitutional right.  The defendant, however, may have several reasons independent of his guilt or non-guilt of that particular charge for exercising his right to remain silent at the guilt phase.  For example, Mr. Hunt faced two other capital charges in the indictment on which he may have wished to exercise his constitutional right not to testify.  The guilt-phase and penalty-phase proceedings are fundamentally different, having different purposes, different interests to the parties, different rules of evidence, different burdens, and different strategies.  For example, there may be evidence that is admissible to rebut the aggravating factor at the penalty phase, but was not admissible at the guilt phase. In that case, the defendant would be statutorily precluded from presenting his otherwise admissible penalty-phase evidence to rebut an aggravating factor he was

not permitted to rebut at the guilt phase.

182.    Furthermore, by precluding the defendant from rebutting the aggravating circumstance during the penalty phase, the statute violates the dictates of a long line of cases by the United States Supreme Court holding that the defendant must be permitted to introduce all relevant mitigating evidence and that the government can not limit the effect the sentencer may give that evidence.  See, e.g., Skipper v. South Carolina, 476 U.S. 1 (1986); Eddings v. Oklahoma, 455 U.S. 104; Lockett v. Ohio, 438 U.S. 586 (1978).

183.    In addition, the United States Supreme Court has held that the defendant must be provided an opportunity to rebut the factors considered by the sentencer.  See, e.g., Gardner v. Florida, 430 U.S. at 349.

184.    Accordingly, for these reasons, individually and cumulatively, Ala. Code § 13A-5-45(e) violates Mr. Hunt's rights not to be compelled to incriminate himself, to remain silent, to trial by jury, to a fair trial, to reliability in sentencing, and to Due process under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.  The state court adjudication of these claims was contrary to, and an unreasonable application of, clearly established United States Supreme Court precedent.

70

**L.    DUE TO PROSECUTORIAL MISCONDUCT AND IMPROPER, INADMISSIBLE, AND PREJUDICIAL ARGUMENTS BY THE PROSECUTOR THROUGHOUT THE GUILT PHASE OF HIS TRIAL, MR. HUNT WAS DEPRIVED OF HIS RIGHT TO A FAIR TRIAL AND TO DUE PROCESS.**

185.    As an elected representative of the people, a prosecutor is a servant of the law whose duty is to see that justice is done, not merely to accomplish a conviction.  Berger v. United States, 295 U.S. at  88.  A prosecutor must avoid any improper methods that might result in an unreliable or unjust verdict.  "[W]hile [the prosecutor] may strike hard blows, he is not at liberty to strike foul ones."  Id. The prosecutorial misconduct in this case, individually and cumulatively, rendered the trial process unreliable and violated Mr. Hunt's rights to due process, a fair trial, an impartial jury, and reliability in sentencing, protected by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

**1.    The Prosecutor's Opening Statement**

186.    In his opening argument, the prosecutor told the jury that the defense attorney would make an opening statement.  With this comment, the prosecutor forced the defense to make an opening statement.  This was improper, because under the Fifth and Fourteenth Amendments to the United States Constitution, the defense was under no obligation to make any such statement, but the prosecutor's comment ensured that the defense would be severely prejudiced if it did not make

such a statement.

187.   In addition, during his opening argument, the prosecuting attorney improperly appealed to the emotions of the jury by having  the victim's father sitting at the prosecutor's table. With the family sitting beside him, the prosecutor stated during his opening that "I thank you and Mr. Sanders and his wife (the victim's parents) thank you."  The presence of the victim's parents at the prosecutor's table during opening statements served no legitimate purpose but only aroused jury sympathy.

188.   Further, having the parents sitting at the prosecutor's table resulted in representing the prosecutor not as an arm of the state, but as the personal avenger for the grieving family.  For these reasons the seating of the parents at the prosecutor's table during the opening arguments was unduly prejudicial to Mr. Hunt.

189.   The prosecuting attorney also improperly expressed his personal opinion during his opening statement:  "The State is not here today to ask you to convict a man on flimsy evidence.  It's not here today to ask you to convict a man on half-baked evidence.  But, we are here today to tell you that the evidence that we will present, we feel, will be overwhelming and at the conclusion of this trial that you will agree with the State of Alabama that the defendant is guilty of capital

murder."

190.    Prosecutors' expressions of personal opinion have no place in a criminal action.  They "unfairly play upon the jury's susceptibility to credit the prosecutor's viewpoint," and are especially improper in a capital trial.  Brooks v. Kemp, 762 F.2d 1383, 1410 (11th Cir. 1985).  Such expressions "are a form of unsworn, unchecked testimony and tend to exploit the influence of the prosecutor's office and undermine the objective detachment that should separate a lawyer from the cause being argued."  United States v. Young, 470 U.S. 1, 8 n.6 (1985).

191.    The prosecutors fabricated evidence of sexual abuse by coercing witnesses, such as Jimmy Lynn Cain and James Carr Sanders, who had been inmates with Mr. Hunt, to state that Mr. Hunt made extrajudicial confessions to them regarding the use of a broom during the crime.

192.    The state court adjudication of these claims was contrary to, and an unreasonable application of, clearly established United States Supreme Court precedent.

2.    **Prosecutor's Guilt-Phase Closing Argument**

193.    During the closing argument, the prosecutor thanked the jury "for Mr. and Mrs. Sanders. Mrs. Sanders can't be with us today."   This statement was an improper attempt to influence jury sympathy by giving the appearance that the

prosecutor is the lawyer for the parents of the victim and not an arm of the State.

It also implied to the jurors that they had an obligation to the victim's family.

194.   The prosecutor stated in his closing argument: "The picture that this

man (defendant) painted to this man's(victim's father) family will always be there.

The prosecutor gestured to Mr. Hunt and then to Mr. Sanders while making this

comment.  The prosecutor also stated that: "This man (Mr. Hunt) painted an 'X'

rated, triple 'X' rated picture for Mr. Sanders to remember for the rest of his life".

These outrageous appeals to jury sympathy severely prejudiced Mr. Hunt.  They

virtually ensured that the jury's verdict would be based on passion, prejudice, and

sympathy, rather than on the evidence properly presented.

195.   The prosecutor also made improper and inflammatory arguments in

his closing argument:  "But I can tell you this, ladies and gentleman of the jury,

when you are trying the devil, sometimes your witnesses have to come from hell."

The prosecutor further used inflammatory religious references by characterizing

Mr. Hunt as "Pharaoh who tries to wash blood from his hands.  The Prosecutor

also told the jurors that Mr. Hunt "made us all look at this triple X rated scene at

this house.  He made us do this.  He made each and every one of you all do that."

The prosecutor thus argued to the jury that if Mr. Hunt had entered a guilty plea

instead of exercising his right to go to trial the jury would not have to view the

grisly and sexually oriented evidence.  It also constituted an impermissible

argument that Mr. Hunt had personally insulted and offended the jurors

themselves.  These arguments were highly improper and require that Mr. Hunt's

conviction and death sentence be vacated.

196.    The prosecuting attorney also made an improper comment regarding

plea bargaining in his guilt-phase closing argument:  "Now. there is another

charge called simple murder, which is a much, much lower charge.  It is a reduced

charge or a lesser charge, that of what we call intentional murder or simple

murder.  Mr. Wilkinson's [defense counsel] whole argument centered around why

this is intentional murder and the reason is because that is a lesser charge.  It is a

reduced charge, sort of like a [district attorney] plea bargaining a case to reduce a

charge."    This comment violated Mr. Hunt's right to have his jury consider lesser

included offenses.  <u>Beck v. Alabama</u>, 447 U.S. 625.  These comments also

improperly injected thoughts about punishment into the guilt phase.

197.    The prosecuting attorney also made the following improper closing

argument in expressing his personal opinion:  "It's overwhelming.  The man's guilt

is overwhelming. . . .  You're going to hear words such as 'reasonable doubt.'

Ladies and gentleman, this case is beyond reasonable doubt.  It is well beyond

that.  It's overwhelming as to guilt. . . .  Ladies and gentleman, I close by saying

[that] if this isn't capital murder, then there has never been capital murder in Walker County."  Additionally, by this argument, the prosecutor impermissibly compared Mr. Hunt's case to other cases in Walker County and urged the jurors to determine whether Mr. Hunt was guilty of capital murder by reference to other crimes in Walker County rather than solely on the evidence presented at trial. Moreover, this argument impermissibly injected into the jury's guilt-phase deliberations notions of punishment, which was irrelevant to the guilt-phase determination.

198.   The prosecuting attorney improperly vouched for the truthfulness of the state's witnesses when he stated in closing argument:  "Everybody else has to be lying if you believe that Greg Hunt is not the guilty man."  These comments shifted to the defendant the burden of proving that the prosecution witnesses were lying.  The prosecutor also stated: "I know Mr. Sanders was at that apartment and you know his nephew was."  "When you look at the evidence you can tell the same thing that I, Mr. Baker and Mr. Sanders can tell...."  This comment rendered Assistant District Attorney Adair, District Attorney Baker, and Mr. Sanders unsworn witnesses in violation of Mr. Hunt's rights under the Sixth and Fourteenth Amendments to the United States Constitution to confront and cross-examine the witnesses against him.

199.  The prosecutor also vouched for and injected into the case his personal belief and the prestige of his office by informing the jury that he believes in his case with all his heart, and that his emotions were sincere and heartfelt.

200.  The prosecutor also improperly suggested that his own witness was not testifying truthfully, without any basis in evidence for that assertion.  In his opening statement, the prosecutor told the jury that one of the State's witnesses, Ms. Kilpatrick, would testify that Mr. Hunt drew on a pad allegedly sexually oriented pictures of a female.  Ms. Kilpatrick actually testified, however, that the pictures were drawn by her husband, who had died months before the trial. Despite this testimony by his own witness and the lack of any testimony to the contrary, the prosecutor argued in closing that the drawings were Mr. Hunt's, telling the jury "that she did say that these doodles on this thing were her husband's.  Ladies and Gentlemen, you saw that lady.  She was an elderly lady. Do you believe any man that age that would be married to her and now deceased, would draw pictures such as this."

201.  The prosecutor also improperly commented on Mr. Hunt's failure to testify:  "So, we all know, and the evidence that has been presented is uncontroverted that this is the bloody palm print of Greg Hunt.  Well, nobody in the courtroom that don't believe that he had a bloody hand.  Ain't nobody in that

courtroom that don't believe that he touched that stair because the defense even

admitted in their opening statement. . . . So I said, 'Is there anything on the right

hand side of those pockets that this jury might be interested in knowing, that

nobody told them about?' This is in evidence, so I said, 'Well, is there anything on

the inside?' . . . What about Greg Hunt's left hand? I know if these are his pants

and if he has a bloody left hand, that left pocket might be significant. Mr. Taylor

made the challenge. He made the challenge."

202.    The right against self-incrimination is one of the fundamental

guarantees in our constitutional system. Estelle v. Smith, 451 U.S. 454, 463

(1981). Once a defendant chooses not to testify at trial, federal and state law

strictly forbid prosecutors from commenting on the defendant's silence. Griffin v.

California, 380 U.S. 609, 615 (1965). The prosecutor in this case violated Mr.

Hunt's not to testify. See Ex parte Wilson, 571 So. 2d 1251 (Ala. 1990); Wherry v.

State, 402 So. 2d 1130, 1133 (Ala. Cr. App. 1981); see also Ala. Code § 12-21-

220 (1975).

203.    The above cited instances of prosecutorial misconduct and improper

argument violated Mr. Hunt's rights against compelled self incrimination, to a trial

by jury, a fair trial, confrontation, due process, and reliability in sentencing under

the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States

Constitution. The state court adjudication of these claims was contrary to, and an

unreasonable application of, clearly established United States Supreme Court

precedent.

**M.    PROSECUTORIAL MISCONDUCT IN MR. HUNT'S PENALTY PHASE RESULTED IN A DENIAL OF MR. HUNT'S RIGHTS TO A FAIR TRIAL AND RELIABLE SENTENCE DETERMINATION.**

204.    The prosecuting attorney committed numerous acts of misconduct in

the penalty phase that, individually and collectively, resulted in a denial of Mr.

Hunt's rights to a fair trial and reliable sentence determination.

205.    After a defendant has shown the existence of mitigating

circumstances, the burden is on the state to show by a preponderance of the

evidence that each circumstance does not exist.  See Ala. Code §§ 13A-5-45(g).

The state failed to make this showing.  The prosecuting attorney made no

arguments whatsoever in reply to the defense's presentation of three mitigating

circumstances; indeed, the prosecuting attorney admitted he had not even heard all

of the defense counsel's presentation.  There was thus no rebuttal to the defense's

showing that the Mr. Hunt was in a state of great emotional turmoil, was under the

influence of drugs or alcohol, and was of a relatively young age.

206.    In the penalty phase, the prosecuting attorney erroneously instructed

the jury as to how it should evaluate the mitigating and aggravating circumstances.

The prosecutor told the jury, "you don't look at them just numerically, but you look at them together and say--well, I'm looking at them together and I'm comparing them and you compare them together, and then you make your recommendation." This was an inaccurate and misleading statement of the law, as the jury does not simply compare the two sets of circumstances. Rather, the jury is required <u>first</u> to determine whether any aggravating factors exist, and whether they are sufficient to warrant imposition of death. Ala. Code § 13A-5-45(f). Only if the jury finds that there are aggravating factors does it move on to consider the mitigating evidence, and then weigh them against each other. Ala. Code § 13A-5-46(e).The prosecutor misstated the relevant law, and misled the jury by suggesting that this two-phase inquiry should be collapsed into one

207. In explaining to the jury the definition of an "aggravating circumstance," the prosecuting attorney instructed the jury that "you have to believe that it [an aggravating circumstance] exists or you couldn't have found the defendant guilty of Count III of the indictment."

208. Thus, he instructed the jury that the sheer fact of defendant's conviction on Count III required that they find an aggravating circumstance. This is incorrect, as a death sentence can never be imposed simply because someone has been convicted of a capital offense. Aggravating circumstances must

genuinely narrow the class of individuals eligible to receive a sentence of death.
Godfrey v. Georgia, 446 U.S. 420 (1980); Gregg v. Georgia, 428 U.S. 153 (1976).
This comment further violated the Eighth Amendment requirement that the jury
make an "individualized determination" of the appropriate sentence. Woodson v.
North Carolina, 428 U.S. 280, 305 (1976).  209.  In instructing the jury on
aggravating circumstances, the prosecuting attorney informed the jury that "you
can consider all the evidence and all the testimony that has come from the witness
stand during this trial." This was patently wrong. In Alabama, the jury is
permitted to consider only the eight aggravating factors set forth in §13A-5-549 of
the Code of Alabama. See Stewart v. State, 659 So.2d 122 (Ala. 1993) (permitting
jury to consider non-statutory aggravating factors is reversible error); Tomlin v.
State, 443 So.2d 47 (Ala. Cr. App. 1979). Instead of cabining the jury's inquiry to
these eight factors, the prosecutor misinformed the jury that it could consider the
entire range of adverse testimony and evidence presented at trial-- including
evidence on factors that the jury was not entitled to weigh as aggravating
circumstances.

    210.   By misinforming the jury of the applicable law, the prosecutor denied
Mr. Hunt a fair trial, due process, and reliability in sentencing under the Fifth,
Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

286.    By instructing the jury to expand its sentencing inquiry to "all the evidence and all the testimony," the prosecution failed to cabin the jury's discretion, and narrow the issues presented, as the sentencing phase is required to do. <u>Gregg v. Georgia</u>, 428 U.S. at 197; <u>Zant v. Stephens</u>, 462 U.S. 862, 877 (1983); <u>McCleskey v. Kemp</u>, 481 U.S. 279, 305 (1987).

211.    The prosecuting attorney misstated the evidence of the victim's injuries in order to inflame the jury's passions. The prosecution argued that Dr. Embry had testified that the victim's injuries to her chest were "sexually oriented injuries" and that the "injuries on her breast area" were "made . . . with that broom." Both of these were incorrect. In fact, Dr. Embry expressly testified that, ""I think the injuries to her chest were <u>not</u> caused by a stick." Moreover, he never testified, nor was there any other evidence, that the injuries to her chest or breast area were "sexually oriented." Rather, Dr. Embry testified only that she suffered some bruising and abrasions to her chest and breast area.

212.    It is improper for a prosecutor to argue facts not in evidence or misstate the facts to the jury. <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637 (1974). This is particularly important in a capital case, where the Eighth Amendment's guarantee of a reliability in the sentence determination comes into play in addition to "the elemental due process requirement that a defendant not be sentenced to

death on the basis of information which he had no opportunity to explain."

Skipper v. South Carolina, 476 U.S. 1, 7 n.1 (1986). The prosecutor's misconduct violated these constitutional guarantees.

213. In addition, the prosecutor's mischaracterization of the evidence served only to inflame the passions of the jury and appeal to their prejudice by sexualizing testimony that contained no such reference. Such appeals to the passion of the jury and inflammatory remarks are impermissible. Viereck v. United States, 318 U.S. 236, 247-48 (1943).

214. The prosecuting attorney repeatedly instructed the jury that "the right thing to do" was to sentence Mr. Hunt to death. This was improper, since a statement suggesting it is the jury's duty or obligation to impose death "has no place in the administration of justice." United States v. Young, 470 U.S. 1, 6, 8-9 (1989). By this statement, the prosecutor incorrectly and impermissibly may have led the jury to believe that it was their legal duty as jurors to impose death.

215. The prosecutor's statement also was a means of informing the jury of his own moral views, and urging them to substitute a moral judgment for an individualized evaluation of the legal evidence concerning Mr. Hunt's sentence. As such, the prosecutor impermissibly expressed his own opinions, and thus denied Mr. Hunt a fair trial, United States v. Young, 470 U.S. at 8, and a reliable

determination of his sentence. <u>Woodson v. North Carolina</u>, 428 U.S. 280, 305 (1976).

216. Each of these statements by the prosecutor, individually and cumulatively, denied Mr. Hunt of his right to a fair trial and a reliable sentencing determination, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. The state court adjudication of these claims was contrary to, and an unreasonable application of, clearly established United States Supreme Court precedent.

**N.    MR. HUNT'S RIGHTS WERE VIOLATED BY THE JURY'S FAILURE TO SPECIFY THE AGGRAVATING AND MITIGATING FACTORS IT FOUND AND ON WHICH IT BASED ITS RECOMMENDATION.**

217. The jury failed to specify the aggravating and mitigating factors it found and on which it based its recommendation. Although the jury makes only a non-binding sentence recommendation to the Trial Court, the jury's consideration of or finding of invalid aggravating factors would nevertheless require reversal of the Trial Court's death sentence. "If the judge must consider the jury verdict in sentencing a capital defendant, as the statute plainly requires, then it follows that a sentence is invalid if the recommendation upon which it partially rests was rendered erroneously." <u>Harris v. Alabama</u>, 513 U.S. 504, 512 (1995). Thus, by

failing to require the jury to specify the aggravating factors on which its recommendation rests, it is impossible to determine whether its recommendation, and therefore the judge's ultimate sentence, rests on improper factors or considerations.

218.   Moreover, it makes it impossible to ensure unanimity by polling the jurors with respect to each aggravating factor found.  In addition, it makes it impossible for a reviewing court to determine the propriety of the recommendation and, therefore, of the ultimate sentence. Accordingly, Mr. Hunt's rights to a reliable determination of the verdict, and to a fair proceeding, were violated by the trial court's failure to require the jury to specify the aggravating factors upon which its recommendation rested.  The state court adjudication of these claims was contrary to, and an unreasonable application of, clearly established United States Supreme Court precedent.

## O.    THE TRIAL COURT IMPERMISSIBLY ALTERED THE PROSECUTION'S BURDEN OF PROOF.

219.   The trial court erred by reducing the State's burden of establishing guilt beyond a reasonable doubt in its opening remarks to the jury.  The Court, after administering the oath to jurors, stated, "Both sides have an opportunity to make an opening statement.  Now, an opening statement is simply a statement. It is not evidence . . . It is a thumbnail sketch of what *both sides, both the state and the*

*defense, expect to show by the evidence."* "Opening statements that both sides

have the opportunity to make are simply a thumbnail sketch of what they expect

the evidence to show."

220.     The trial court further shifted the burden of proof from the State to

the defense when it informed the jurors, "Then the state puts on its case and the

defense has the opportunity to put on its case." The Court also shifted the burden

of proof when he told the jury that it was its duty to determine the guilt or

innocence of the defendant. "Innocence," however, is not one of the choices of

verdicts. Rather, the permissible verdicts are guilty or not guilty. That is, the

verdict is to be based on whether the prosecution has proved its case against the

defendant beyond a reasonable doubt or whether it has failed to prove beyond a

reasonable doubt the defendant's guilt of the crimes charged. Thus, even if the

jury does not believe that the defendant is innocent, the jury must nevertheless

return a verdict of not guilty, unless the prosecution proved the defendant's guilt

beyond a reasonable doubt. By telling the jury it was to determine whether Mr.

Hunt is innocent, the trial court lessened the burden of proof required for

conviction and, in fact, shifted to Mr. Hunt the burden of proving innocence. The

Court's comments violated Mr. Hunt's rights to a trial by jury, a fair trial, due

process, and reliability in sentencing under the Fifth, Sixth, Eighth, and Fourteenth

Amendments to the United States Constitution. The state court adjudication of these claims was contrary to, and an unreasonable application of, clearly established United States Supreme Court precedent.

**P.    THE USE OF THE HEINOUS, ATROCIOUS OR CRUEL AGGRAVATING CIRCUMSTANCE IN THIS CASE VIOLATED MR. HUNT'S RIGHTS GUARANTEED BY THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.**

221.    The trial court instructed the jury and found in its sentencing order the aggravating circumstance provided under Ala. Code § 13A-5-49(8) (1975). The use of that aggravating circumstance in Alabama cases suffers from vagueness and overbreadth. In this case, the trial court expressly stated in its sentencing order that, "to some extent, every capital case" contains this aggravating circumstance. The application of this aggravating circumstance in this case and in the state of Alabama generally is unconstitutional. Maynard v. Cartwright, 486 U.S. 356 (1988). The state court adjudication of this claim was contrary to, and an unreasonable application of, clearly established United States Supreme Court precedent.

**Q.    THE TRIAL COURT VIOLATED MR. HUNT'S CONSTITUTIONAL RIGHTS WHEN IT REFUSED TO GRANT MR. HUNT'S REQUEST FOR A CONTINUANCE DUE TO JURORS' INFIRMITY.**

222.    The trial court refused to grant Mr. Hunt's Motion for a Continuance based on defense counsel's representation that one juror selected for trial was

suffering "from an ear condition which makes him almost totally deaf" and "another juror is suffering from a heart condition." Moreover, the court failed to explore the abilities of the two jurors to hear trial testimony based on defense counsel's representations of their physical disabilities. These rulings were in error, depriving Mr. Hunt of his right to trial by jury and due process pursuant to the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution. The state court adjudication of these claims was contrary to, and an unreasonable application of, clearly established United States Supreme Court precedent.

## R.    THE TRIAL COURT ERRED IN PERMITTING THE VICTIM'S FATHER TO SIT AT THE PROSECUTION'S TABLE THROUGHOUT THE TRIAL.

223.    The court erred in inflaming the passions and prejudices of the jury venire panel by allowing the father of the victim, Mr. W.O. Sanders, to be seated next to the Prosecuting attorney at the commencement of jury selection. By allowing such an arrangement, the court fostered the implication that the victim's father had a special relationship with the Prosecuting attorney and engendered sympathy for the prosecution, as well as the victim and her family, thus denying Mr. Hunt a fair trial, due process, and reliability in sentencing. The state court adjudication of these claims was contrary to, and an unreasonable application of, clearly established United States Supreme Court precedent.

88

**S.      THE TRIAL COURT'S FAILURE TO PROVIDE A TRIAL TRANSCRIPT FOR JURY READ BACK AND ALLOWING THE JURY TO REVIEW UNSWORN EVIDENCE VIOLATED MR. HUNT'S CONSTITUTIONAL RIGHTS**.

224.    The trial court erred in allowing jurors to take notes during the trial while at the same time making no allowance for the preparation of a trial transcript during the introduction of evidence throughout the trial.  Thus, the court, in allowing the jurors in effect the opportunity to review unsworn evidence and their potentially incorrect  recorded notes during deliberations without the opportunity of a trial transcript  read back deprived Mr. Hunt of due process and the right to a fair trial under the Fifth, Sixth, Eight, and Fourteenth Amendments to the U.S. Constitution. The state court adjudication of these claims was contrary to, and an unreasonable application of, clearly established United States Supreme Court precedent.

**T.      THE TRIAL COURT'S CONSIDERATION OF INADMISSIBLE EVIDENCE AT SENTENCING, INCLUDING A PREJUDICIAL PRESENTENCE REPORT, DEPRIVED MR. HUNT OF A RELIABLE DETERMINATION OF PUNISHMENT**.

225.    Prior to sentencing Mr. Hunt to death, the trial court considered a presentence report prepared by the Alabama Board of Pardons and Parole.  This report was replete with inaccurate and  incomplete information, inadmissible evidence, and hearsay. The state court adjudication of this claim was contrary to,

89

and an unreasonable application of, clearly established United States Supreme

Court precedent.

**U.    THE DEATH PENALTY IN THIS CASE WAS SOUGHT AND
       IMPOSED PURSUANT TO A PATTERN OF RACIAL BIAS.**

226.    The victim in this case was part of the white community of Walker

County.  The death penalty was sought and imposed in this case because of her

race and status.  If she had been poor and black, Mr. Hunt would not have been

sentenced to death.

227.    Because the death penalty is sought and imposed in Walker County

and the state of Alabama pursuant to a racially discriminatory pattern, Mr. Hunt's

death sentence violates the Fifth, Sixth, Eighth and Fourteenth Amendments to the

United States Constitution.  <u>McCleskey v. Kemp</u>, 481 U.S. 279 (1987).  The state

court adjudication of this claim was contrary to, and an unreasonable application

of, clearly established United States Supreme Court precedent.

**V.    THE MANNER OF EXECUTION USED BY THE STATE OF
       ALABAMA CONSTITUTES CRUEL AND UNUSUAL
       PUNISHMENT.**

228.    Alabama executes condemned prisoners by lethal injection.  The

method of execution and the process by which it is accomplished is cruel,

torturous, and violative of state and federal law.

229.     Imposition of the death penalty constitutes cruel and unusual

90

punishment in this case, and is unconstitutionally imposed on Mr. Hunt. The

Eighth Amendment requires that states employ all feasible measures to minimize

the risk of cruelty when inflicting capital punishment. Zant v. Stephens, 462 U.S.

862 (1983). Justice Powell, in his dissent to Furman, noted that "no court would

approve any method of implementation of the death sentence found to involve

unnecessary cruelty in light of presently available alternatives. Furman v.

Georgia, 408 U.S. 238, 460 (1972). See Trop v. Dulles, 356 U.S. 86, 101 (1958).

Fundamental concepts of human dignity — protected by the Eighth Amendment

— require that an execution is effected so as to minimize mutilation, pain, and

distortion of the condemned person's body.

230.    If Mr. Hunt is executed in Alabama, his death is likely to be slow and

excruciating.   Training of personnel to carry out the executions is inadequate and

cursory.  Such risk of error is neither remote nor unlikely, and is constitutionally

intolerable.  It is further inconsistent with society's evolving standards of decency

and is also in violation of international law, made applicable to the states by the

Supremacy Clause of the United States Constitution. *See, e.g, The Convention*

*against Torture and Other Cruel, Inhuman or Degrading Treatment or*

*Punishment*, October 21, 1994. To execute Mr. Hunt in the manner currently

employed in Alabama would deny Mr. Hunt his rights under Article VI, cl.2 and

the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States

Constitution, and international law. The state court adjudication of this claim was

contrary to, and an unreasonable application of, clearly established United States

Supreme Court precedent.

## W.   MR. HUNT WAS ARRESTED WITHOUT PROBABLE CAUSE IN VIOLATION OF THE FOURTH AMENDMENT.

231.   Mr. Hunt was arrested on August 3, 1988, with a warrant lacking

information indicating that there was probable cause to believe that Mr. Hunt had

committed a crime.  Mr. Hunt was thus arrested in violation of his right to be free

from unreasonable seizures under the Fourth and Fourteenth Amendments to the

United States Constitution.  Dunaway v. New York, 442 U.S. 200 (1979).

Evidence obtained as a result of the initial illegal arrest was fruit of the poisonous

tree and was therefore unconstitutionally used against Mr. Hunt at his capital trial.

Wong Sun v. U.S., 371 U.S. 471 (1963); Cox v. State, 489 So. 2d 612 (Ala. Crim.

App. 1985).  The state court adjudication of this claim was contrary to, and an

unreasonable application of, clearly established United States Supreme Court

precedent.

## X.    THE STATE POST-CONVICTION HEARING WAS UNRELIABLE AND UNCONSTITUTIONAL.

232.   The state courts deprived Mr. Hunt of a full and fair post-conviction

hearing by finding that a number of Mr. Hunt's claims were procedurally barred. The state courts overlooked evidence to support many of Mr. Hunt's claims that was not previously available, either due to trial counsel's ineffectiveness or prosecutorial misconduct. That evidence included, but was not limited to, the full record of prosecution witness James Sanders' criminal dispositions at the time of trial, showing that he obtained favorable resolutions of his pending criminal cases after he testified for Mr. Hunt; the composition of his grand jury; the extent of pre-trial publicity; proof concerning his trial and appellate counsel's failure to investigate; and the mitigating circumstances, including Mr. Hunt's extremely abusive family background and drug and alcohol abuse, that trial and appellate counsel had failed to discover.

233.  The circuit court also improperly denied Mr. Hunt adequate time and resources to prepare for a post-conviction hearing. Mr. Hunt is incarcerated and indigent.  He was unable to conduct an adequate investigation, interview witnesses, or pay for appropriate testing.

234.  The circuit court also refused to admit evidence proffered by Mr. Hunt in support of his claims, refused to permit full briefing of those claims, and applied erroneous standards of law in its evaluation of his claims.

235.  The circuit court erred by signing *in toto* a proposed order dismissing

93

the petition prepared by the Alabama Attorney General, without even correcting the mis-spellings therein or reference to a wholly other defendant, and the state appellate courts erred by affirming the circuit court's entry of this boilerplate order.

**Y.   THE CUMULATIVE EFFECT OF THE ERRORS DISCUSSED ABOVE VIOLATED MR. HUNT'S RIGHTS PROTECTED BY ALABAMA LAW AND THE FOURTH, FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, THE ALABAMA CONSTITUTION, AND ALABAMA LAW.**

236.   Individually and cumulatively, the errors discussed in each of these claims violated Mr. Hunt's rights to the effective assistance of counsel, reliability in sentencing, trial by jury, an impartial jury, due process and a fair trial protected by the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, the Alabama Constitution, and Alabama law. Kyles v. Whitley, 115 S.Ct. 1555, 1560, 1578 (1995); Strickland, 466 U.S. 668; Daniel v. Thigpen, 742 F.Supp. 1535 (M.D. Ala. 1990).

**IV.   PRAYER FOR RELIEF**

For all of the above stated reasons and other such reasons as may be made upon amendment of this petition and a full evidentiary hearing, Gregory Hunt respectfully asks this Honorable Court to grant him the following relief:

(a)  afford petitioner an opportunity to reply to any responsive pleading filed

by respondent;

(b) grant petitioner discovery under Rule 6 of the Rules Governing Habeas Corpus Cases and a sufficient period of time to conduct discovery, and further grant petitioner authority to obtain subpoenas to further document and prove the facts set forth in this petition;

(c) grant petitioner an evidentiary hearing at which additional proof may be offered supporting the allegations set forth in this petition;

(d permit petitioner after additional factual development an opportunity to brief and argue the issues presented in this petition;

(e) issue a writ of habeas corpus granting Mr. Hunt relief from his unconstitutionally obtained conviction and sentence of death; and

(f) grant such further and other relief as may be appropriate.

Dated: June 20, 2006                    Respectfully submitted,

_____
Arnold Levine
11 Park Place, Suite 606
New York, NY 10007
(212) 732-5800

Mary Lynne Werlwas
The Legal Aid Society
199 Water Street, 6th Floor
New York, New York 10038
212-577-3530
Counsel for Mr. Hunt

95

## ATTORNEY'S VERIFICATION

I affirm under penalty of perjury that, upon information and belief, this

Petition for Writ of Habeas Corpus is true and correct.  Signed on June 20, 2006.


_____

Arnold Levine
The Legal Aid Society
199 Water Street, 6th Floor
New York, New York 10038
212-577-3530

Counsel for Mr. Hunt



## CERTIFICATE OF SERVICE

I certify that on June 20, 2006, I served a copy of the attached amended

petition by first-class mail on:

Corey Maze
Office of the Attorney General
11 South Union Street
Montgomery, AL 36130


_____

Mary Lynne Werlwas